Argued January 21, affirmed March 12, petition for
rehearing denied April 22, 1970. Petition for
review denied by Supreme Court
June 16, 1970

## STATE OF OREGON, *Respondent, v.*
## DANIEL PAUL MURPHY,
### *Appellant.*

465 P2d 900

*Oscar D. Howlett,* Portland, argued the cause and filed the briefs for appellant.

*Jacob B. Tanzer,* Solicitor General, Salem, argued the cause for respondent. With him on the brief was George Van Hoomissen, District Attorney, Portland.

Before Schwab, Chief Judge, and Langtry and Foley, Judges.

SCHWAB, C. J.

The defendant was tried to a jury on the charge of murder of his wife. He was convicted of murder in the second degree. On appeal he contends that fingernail scrapings taken from him against his will were wrongfully received in evidence. The state produced testimony that analysis of the scrapings revealed skin, blood cells, and white cotton fiber. This evidence was obviously introduced as tending to prove

that the defendant had acquired these substances under his fingernails by strangling his wife while she was in bed.

At the time the police took the fingernail scrapings they had not formally arrested the defendant. He was not charged with murder or any other crime until about a month later. The defendant's position is that the police did not have a right to search him by taking scrapings from his fingernails without his consent and without a warrant except as incident to a lawful arrest.

We borrow in large part from the statement of facts in defendant's brief.

On August 25, 1967, City of Portland detectives, Hutchins and Prunk, were assigned to investigate the murder of Doris Murphy. They arrived at the Murphy home shortly after 8 a.m. They could see throat lacerations and abrasions and it appeared to the detectives that Mrs. Murphy had been strangled. The deceased was lying on her back in bed and the bed was perfectly made up. There were no signs of forced entry, struggle, or robbery. The detectives talked to the son of the deceased and defendant. The son told them that the defendant had been away and had been expected home the night of August 24. By making a telephone call to Camp Sherman, Oregon, and talking to a Mr. Jones, the detectives learned that the defendant had left Camp Sherman on the night of the 24th to go to Portland. They also learned from the defendant's son that the deceased and the defendant did not get along well and in the past "had fights." While talking to the son the detectives noticed that he had "no fingernails." Through Mr. Jones Detective

Prunk left a death message at Camp Sherman for defendant.

At 4 p.m. on the same day, August 25, defendant called the Portland police station and talked to Detective Prunk. Without asking any questions about his wife defendant immediately began to tell Prunk where he had been the night before. He also agreed to come to Portland immediately. Defendant told Prunk on the telephone that he had left Camp Sherman about 8 p.m. the night of the 24th in his old pickup to bring a washing machine to Portland to be repaired and on the way had stopped in Salem for a couple of drinks. When he got home the door was locked so he slept in the pickup parked in the driveway. Early in the morning he woke up and tried to push the truck out of the driveway because it made a lot of noise, but it got caught in the step or curb. He then drove off to another place where he slept until daylight and then took the washing machine to be repaired.

The defendant did return to Portland and went to the Portland police station about 7:45 p.m. When Detective Hutchins saw the defendant in the police station he noticed a dark spot on defendant's right thumb. This prompted him to think about fingernail scrapings although, as he put it, he probably would have anyway in view of the fact that he had observed lacerations on the throat of the deceased. While the defendant and the detectives were discussing the case, two lawyers representing the defendant arrived. The discussion continued after the lawyers arrived and during this time a deputy district attorney who was present and the two detectives discussed taking fingernail scrapings. The defendant refused to give the fingernail scrapings or to take a polygraph test and

exhibited a disinterest in the case. Nevertheless, the police detained the defendant long enough to take the scrapings in question and then released him.

■ By holding the defendant long enough to take fingernail scrapings from him, the detectives did not *arrest* the defendant in the strict sense of the word. An *arrest* in its strict sense is the taking of a person into custody for the commission of an offense as the prelude to prosecuting him for it. *Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968). It follows that the state cannot rely on the rule that "The notable exception to the demand for a search warrant is, of course, the search made as an incident of a lawful arrest." *State v. Chinn,* 231 Or 259, 373 P2d 392 (1962). This rule, however, is not determinative of the case at hand for, while the incident-to-arrest exception is "notable," it does not follow that it is exclusive.

"* * * In terms of the quantum of evidence required, this [probable cause for a search] is substantially the equivalent of the probable cause needed for an arrest warrant and of the reasonable grounds needed for an arrest without warrant." LaFave, *Search and Seizure: The Course of True Law * * * Has Not * * * Run Smooth.* 255 Ill L Forum 259-60 (1966).

■ In the usual situation, as in this case, the same evidence that constitutes probable cause to arrest constitutes probable cause to search the person arrested for evidence of the crime for which he is seized. Perhaps this is the reason that in many cases courts have upheld warrantless searches which came prior to arrest by characterizing the searches as "incident to arrest."

"Search before arrest is not uncommon in current practice. In some instances, the search pre-

cedes the formal announcement of arrest because it is necessary for the officer to act quickly for his own protection. In many instances, however, no formal announcement is made because the officer knows that the person will not actually be taken to the station unless the search proves to be fruitful. That is, in those cases where the defendant might be arrested because of reasonable grounds to believe he presently possesses contraband, the common sense sequence—as far as the police are concerned—is search followed by arrest only if contraband is found, as opposed to arrest, search, and then release if nothing is found.

"In these and similar cases, the better view is that the search is not unlawful merely because it precedes the arrest. Such is the California position, which has been explained as follows:

" 'Thus, if the officer is entitled to make an arrest on the basis of information available to him before he searches, and as an incident to that arrest is entitled to make a reasonable search of the person arrested and the place where he is arrested, there is nothing unreasonable in his conduct if he makes the search before instead of after the arrest. In fact, if the person searched is innocent and the search convinces the officer that his reasonable belief to the contrary is erroneous, it is to the advantage of the person searched not to be arrested. On the other hand, if he is not innocent or the search does not establish his innocence, the security of his person, house, papers, or effects suffers no more from a search preceding his arrest than it would from the same search following it.'[284]"

" * * * * * .

"[284] People v. Simon, 45 Cal. 2d 645, 648, 290 P.2d 531, 533 (1955)." LaFave, *Search and Seizure* * * *, supra, at 303.

The majority of the Oregon Supreme Court apparently is of the same mind as the California court in

*People v. Simon,* 45 Cal2d 645, 290 P2d 531 (1955). In *State v. Elk,* 249 Or 614, 439 P2d 1011 (1968), those who concurred in the prevailing opinion characterized as incident to arrest a car search which occurred 20 to 25 minutes prior to arrest and 200 to 250 yards away. The search was upheld on the basis of a more realistic, workable and theoretically sound rationale in two concurring opinions which represented the views of four concurring justices. While the two concurring opinions were not in complete agreement on all of the issues of that case they shared the same view on the issue we are here considering. The view upon which the four concurring justices agreed is set forth in that portion of Mr. Justice O'CONNELL's opinion which states:

> "The majority opinion upholds the search in the present case on the ground that it was incident to the arrest. This is erroneous. A search and seizure cannot be an 'incident' of an arrest which took place at a later time. It is not made any the more so by assertions that 'the arrest and search were part of one uninterrupted transaction' or that the search is 'not remote in time or place from the site of the arrest.'

> "However, the search and seizure in the present case can be upheld upon another ground. The information Officer Rothermel had received, together with his observations before lifting the trunk lid, was sufficient to give him probable cause to believe that the stolen gun was in the trunk. Upon the basis of this information, there would have been no difficulty in obtaining a search warrant. But to obtain a warrant it would have been necessary for Rothermel to leave the car and if he left it he could not know when the person who drove the car there would return and drive it away together with the evidence in it. Rothermel had been informed that those who had driven up in the car were in

the immediate vicinity. Because of the risk of losing the evidence if a warrant were sought, it was impracticable to obtain a warrant. Under these circumstances a search of the trunk was reasonable." *State v. Elk,* supra, at 624-25.

■ If the police had probable cause to search the defendant and probable cause to believe that it was necessary that they search him without taking the time to first obtain a search warrant, their right to search him immediately was not defeated by their failure to exercise their right to arrest him. "There is no constitutional right to be arrested." *Hoffa v. United States,* 385 US 293, 87 S Ct 408, 17 L Ed 2d 374, reh den 386 US 940 (1966). To hold otherwise would be to require the police to arrest so as to search incident to that arrest. The court should not require greater invasion of privacy where lesser invasion would satisfy the public purpose. Situations exist where arrest would be unwise despite the circumstances of probable cause. Cf. *Hoffa v. United States,* supra. While the existence of probable cause authorizes state seizure by way of (1) arrest, and (2) search to prevent destruction of evidence (see *State v. Chinn,* supra, at 267), there appears no reason to require the police to do both or neither. If the public safety is satisfied by the lesser invasion of defendant's privacy, by search alone, the law should not encourage, or indeed require, the police to arrest prematurely in order to justify a search already justified by prior probable cause.

■ We hold that the right of the police to search without a warrant is a right not solely dependent upon a prior or contemporaneous arrest. The relevant issue is not whether the defendant was arrested, but whether

the warrantless search was based on probable cause. The questions basic to this determination are:

(1) Did the police have probable cause to believe that a search of the defendant's person would result in the finding of evidence of homicide?

(2) Did the police have probable cause to believe that if the search were not made immediately without taking the time to seek and obtain a warrant the evidence might well be lost?

*State v. Keith*, 2 Or App 133, 465 P2d 724, Sup Ct.

■ The facts in the case at hand justified the warrantless search. At the time the police took the fingernail scrapings they had probable cause to believe that the defendant was guilty of strangling his wife. They did not have evidence beyond a reasonable doubt, but they did have what they needed, i.e., reasonable ground for suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief. *State v. Keith,* supra.

One of the detectives who had had previous experience in this type of homicide knew that throat lacerations were frequently produced by fingernails and that evidence in the form of blood, skin and fibers could sometimes be found under the fingernails of assailants in such cases. At the time the detectives took these scrapings they knew:

The bedroom in which the wife was found dead showed no signs of disturbance, which fact tended to indicate a killer known to the victim rather than to a burglar or other stranger.

The decedent's son, the only other person in the house that night, did not have fingernails which

could have made the lacerations observed on the victim's throat.

The defendant and his deceased wife had had a stormy marriage and did not get along well.

The defendant had, in fact, been at his home on the night of the murder. He left and drove back to central Oregon claiming that he did not enter the house or see his wife. He volunteered a great deal of information without being asked, yet expressed no concern or curiosity about his wife's fate.

Unless the defendant were bound, manacled, guarded or by some other means placed in a position where he could not clip his fingernails, scrape the nails of one hand with the nails of another, put his fingers in his mouth or go to the lavatory from the time the police asked him for permission to take fingernail scrapings until the time that they sought and obtained a warrant, it was entirely likely that the evidence would have been destroyed in the interim. Proper application of the Fourth Amendment does not require such extremes. The search of the defendant did not violate his constitutional rights to freedom from unreasonable search and seizure.

Affirmed.