Argued July 27, reversed and remanded October 29, petition for rehearing denied December 20, 1973, petition for review allowed March 19, 1974. See later issue Oregon Reports

STATE OF OREGON, *Respondent*, *v.* DANIEL HAROLD FLORANCE (No. 82441), *Appellant.*

515 P2d 195

*J. Bradford Shiley,* Portland, argued the cause and filed the brief for appellant.

*John H. Clough,* Assistant Attorney General, Sa-

lem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and John W. Osburn, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and FOLEY and FORT, Judges.

SCHWAB, C. J.

Defendant was charged with one count of menacing, ORS 163.190, and four counts of criminal activity in drugs, ORS 167.207, for possession of marihuana, Numorphan, MDA (alpha-methyl-3-4-methylenedioxyphenethylamine), and cocaine. A jury found him not guilty of menacing and possession of marihuana, and guilty of the other three counts of criminal activity in drugs. The trial judge entered a single conviction and imposed a single sentence.[1] Defendant appeals, contending the drugs introduced at trial were illegally seized. This contention raises important questions concerning searches and seizures incident to an arrest, and "booking searches" (also called "booking inventories") made when an arrested person is jailed.

The record at the motion to suppress hearing is far from a model of clarity. It appears that Officer Forristahl was investigating a burglary in which defendant was a suspect. The officer spoke with defendant on February 5, 1973, at which time he recovered some stolen property, apparently connected with the burglary under investigation. Something was said at

---

[1] While the question has not been argued, it would appear that the trial judge was correct in treating the simultaneous possession of three different drugs as one, not three, violations of the prohibition against criminal activity in drugs, ORS 167.207. *See,* State v. Miller, 14 Or App 396, 513 P2d 508 (1973).

that time about defendant's also trying to obtain and return a stolen television set.

On February 14, the officer went to the farm where defendant was working to inquire further about the stolen television set. The officer and defendant talked from opposite sides of a fence. Forristahl testified that defendant refused to continue to cooperate in the recovery of the television set, shouted obscenities and turned and started to walk away. The officer also testified that he shouted that defendant was under arrest for burglary, jumped the fence with his gun drawn, and that defendant then turned toward him and thrust a pitchfork at him. Two witnesses, testifying for the defendant, stated that defendant had not shouted, that Forristahl had said nothing about defendant's being under arrest for burglary, and that defendant had not thrust a pitchfork at the officer.

Forristahl took the defendant into custody, handcuffing him. Defendant was searched and everything was removed from his pockets, including his wallet.

Forristahl and his partner took the defendant to the Estacada City Hall to complete certain reports that were never fully described in the record. Defendant refused to answer the officers' questions concerning name, address, date of birth, etc. On cross-examination Forristahl admitted that he had written a report concerning his February 5 contact with defendant. The record implies that this report contained all or most of the information the officers needed to complete their February 14 report.

Forristahl then opened defendant's wallet, supposedly in search of information needed for his report. Upon opening the wallet the officer saw several little plastic bags containing powdered substances. The officer did not testify that he recognized these pow-

dered substances as illegal drugs. However, for reasons not of record, Forristahl seized these plastic bags and caused their contents to be chemically analyzed. They proved to contain illegal drugs which formed evidentiary basis of the three counts of criminal activity in drugs of which defendant was eventually convicted.[5]

## I

■ Defendant's initial contention is that there was no probable cause to arrest him on February 14, and that the arrest's being invalid, everything which followed was tainted by that invalidity. On this record we hold defendant was validly arrested for menacing. Forristahl testified that defendant thrust a pitchfork at him.[6] Two other witnesses testified to the contrary. At a suppression hearing the trial judge is the trier of fact, and we are bound by his findings if supported by substantial evidence. *State v. Blackburn/Barber*, 266 Or 28, 511 P2d 381 (1973); *Ball v. Gladden*, 250 Or 485, 443 P2d 621 (1968); *State v. Fisher*, 5 Or App 483, 484 P2d 864 (1971). In this case, the trial judge chose to believe Forristahl and to disbelieve the other witnesses. *See*, n 4, infra. Forristahl's testimony reveals sufficient probable cause to arrest defendant for menacing.

---

[5] Apparently, the basis of the possession of marihuana charge, on which the jury found defendant not guilty, was some residue in a pipe also seized from defendant at the time of his arrest. There is no explanation in the record of why Officer Forristahl caused the residue in the pipe to be chemically analyzed. However, since defendant was found not guilty of this charge, the legality of this seizure is not before us.

[6] ORS 163.190 provides:

"(1) A person commits the crime of menacing if by word or conduct he intentionally attempts to place another person in fear of imminent serious physical injury.

"(2) Menacing is a Class A misdemeanor."

■ Since at trial defendant was found not guilty of the menacing charge, we assume the jury chose to believe defendant's witnesses and disbelieve Officer Forristahl, or at least had a reasonable doubt about which version was true. However, this contrary resolution of the conflict in the testimony at trial does not in any way negate the trial judge's resolution for purposes of the motion to suppress.

It is likely that there was also probable cause to arrest defendant for burglary, although the record is much less clear on this aspect of the case. In any event, however, having found the arrest valid for one offense, we need not resolve whether it would also be valid for another offense.

Following defendant's arrest, there was a series of events leading to the discovery and seizure of the drugs in question: (1) defendant's wallet was seized at the time of his arrest; (2) the wallet was subsequently searched; and (3) the powder which proved to be drugs was seized for analysis. Below we discuss each of these events in light of the rules governing searches and seizures incident to arrest, Part II, infra; and the rules governing booking searches and seizures, Part III, infra.

## II

The trial court upheld the legality of the seizure of the drugs in question based on a finding that the drugs were seized as part of a search incident to defendant's arrest.[4] This line of analysis cannot be sustained.

---

[4] The trial court ruled:

"* * * [T]he officer testified, I'm going to believe what he

124

■ Since this was a warrantless search and seizure, the state has the burden of establishing its validity. *State v. Douglas,* 260 Or 60, 68, 488 P2d 1366 (1971), *cert denied* 406 US 974 (1972). Or, stated differently, "searches and seizures conducted without search warrants 'are *per se* unreasonable,' subject to 'a few specifically established and well-delineated exceptions' * * *." *State v. Douglas,* supra, 260 Or at 67, quoting from *Coolidge v. New Hampshire,* 403 US 443, 91 S Ct 2022, 29 L Ed 2d 564 (1971). One of the recognized exceptions to the warrant requirement is that, when arrested, a person can be searched incident to that arrest for the purposes set forth below. *Chimel v. California,* 395 US 752, 89 S Ct 2034, 23 L Ed 2d 685 (1969); *State v. Chinn,* 231 Or 259, 373 P2d 392 (1962).

## A

■ Since there was a lawful arrest, Part I, supra, Officer Forristahl and his partner were entitled, incident to the arrest, to search defendant's person for: (1) weapons, both for their safety and to prevent escape; and (2) evidence relevant to the crime for which defendant was arrested. *See, Chimel v. California,* supra; *State v. Chinn,* supra. But the officers did not search defendant's wallet at the time of his arrest.

---

said was reasonable, and I'm going to believe that he went out there not with the idea of making an arrest, that the discussion turned into argument, that he did make an arrest; that he went over the fence and that the defendant—I don't have any doubt in my mind, did make a menacing gesture with the pitchfork. That he was also placed under arrest for that charge. As an incident to that arrest he was searched but that search showed possession of those other articles. That the search and the arrest was made legally and with probable cause. That the search was reasonable.

"Now, those are my conclusions. I don't have any doubt in my mind and I will deny your motion to suppress."

They merely seized the wallet along with everything else in defendant's possession. Was this *seizure* of the wallet valid?

Some cases hold that if the police are entitled to search an item at the time of an arrest, they may instead seize the item at the time of the arrest and search it at a later time.[5] On the other hand, there are cases that suggest that the police were not entitled, on the facts of this case, either to search or to seize defendant's wallet at the time of his arrest.[6]

---

[5] United States v. Mehciz, 437 F2d 145 (9th Cir), *cert denied* 402 US 974 (1971); United States v. Lipscomb, 435 F2d 795 (5th Cir 1970), *cert denied* 401 US 980 (1971); United States v. Robbins, 424 F2d 57 (6th Cir 1970), *cert denied* 402 US 985 (1971); Malone v. Crouse, 380 F2d 741 (10th Cir 1967), *cert denied* 390 US 968 (1968).

[6] The extent of authority to search and seize incident to arrest may depend upon whether the officers are looking for weapons or evidence. We have upheld the authority of the police to make a thorough search for weapons, State v. Swartsfager, 95 Adv Sh 1306, 11 Or App 69, 501 P2d 1321 (1972), except incidental to minor traffic arrests, State v. Gwinn, 12 Or App 444, 506 P2d 187, Sup Ct *review denied* (1973).

However, when the search is for evidence, "[a]s a general rule, the search [incident to arrest] must be reasonably related to the offense which prompts the arrest." State v. Krogness, 238 Or 135, 144, 388 P2d 120 (1963), *cert denied* 377 US 992 (1964). A general exploratory search for evidence is vulnerable to attack on the grounds of undue intensity. State v. O'Neal, 251 Or 163, 444 P2d 951 (1968); State v. Chinn, 231 Or 259, 267-68, 373 P2d 392 (1962); United States v. Cally, 259 F Supp 539 (SD NY 1966) (search carried out by five officers held unreasonable where the defendant was a 68-year-old man arrested for tax evasion allegedly committed five or six years prior to arrest).

The reasonableness of the intensity of a search incident to arrest is primarily a function of the offense for which the arrest is made. "A search which might be reasonable as incidental to an arrest for one crime may be entirely unreasonable as an incident to an arrest for another crime. State v. Dodd, 28 Wis 2d 643, 648, 137 NW2d 465 (1965).

While these authorities involve overly-intense *searches* inci-

In view of our disposition of the other issues presented it is not necessary to resolve this question. We assume for purposes of discussion, but do not decide, that the seizure of defendant's wallet at the time of his arrest was valid.

## B

Was the subsequent search of the wallet at the Estacada City Hall valid? This search occurred sometime after the arrest (the record does not disclose how long), some distance from the scene of the arrest (the record does not disclose how far). This search of the wallet clearly cannot be justified as being *incident* to defendant's arrest.

"The search must be an incident of the arrest, i.e., close to the arrest both in time and space * * *." *State v. Chinn*, supra, 231 Or at 267. Or, stated differently, "[O]nce an accused is under arrest and in custody, then a search made at another place * * * is simply not incident to the arrest." *Preston v. United States*, 376 US 364, 367, 84 S Ct 881, 11 L Ed 2d 777 (1964).

> "The very notion of a search *incident* to an arrest connotes spatial contiguity and temporal proximity. To hold otherwise would eliminate all pretense of a rational nexus between the search and the arrest and would be tantamount to saying that an individual legally arrested thereby forfeits all protection under the fourth amendment * * *." Cook, *Warrantless Searches Incident to Arrest*, 24 Ala L Rev 607, 608 (1972).

---

dent to an arrest, the same reasoning would seem to apply to an overly-intense *seizure*.

In this case, there is nothing to indicate that the arresting officers had any reason to believe that evidence of the crime of menacing with a pitchfork or burglary of a television set might have existed in defendant's wallet.

In this case, either the search of defendant's wallet was too remote in time and place to be part of a search incident to arrest, or at the very least it cannot be said that the state sustained its burden of proving a reasonably contemporaneous search under the circumstances of this case.

## C

Even if both the seizure and subsequent search of defendant's wallet were valid as incident to arrest, the seizure of the drugs therefrom was not. *State v. Elkins,* 245 Or 279, 422 P2d 250 (1966).

In *Elkins,* the defendant was arrested for public intoxication. In the course of a search incident to that arrest, an officer discovered various pills in the defendant's possession. Although the officer suspected the pills might be illegal drugs, he did not have probable cause to so believe. The officer nevertheless seized the pills and caused them to be chemically analyzed. They proved to be illegal drugs, and defendant was convicted for possessing them. The Supreme Court reversed based on a finding that the seizure of the pills was invalid.

■ *Elkins* holds that (1) if in the course of an appropriately limited search incident to an arrest an officer discovers evidence of another crime being committed in his presence, such as possession of contraband, he is entitled to seize it, (2) provided he has probable cause to believe it is, in fact, contraband.

■ The seizure of the powdered substances from defendant's wallet was invalid under the second holding of *Elkins*. The officers who made the seizure said absolutely nothing at the suppression hearing about why they seized the drugs. The officers may well have had

probable cause to believe the powdered substances were illegal drugs, but such evidence did not find its way into this record.

### III

As an alternative theory on appeal, the state contends that the search of defendant's wallet and seizure of drugs therefrom were permissible as part of an inventory during the booking process.

### A

■ If defendant's wallet had not been taken from him at the scene of his arrest, there is no doubt that it could have been taken from him as part of the booking procedure. Indeed, when an arrested person is being jailed, officials at the jail can take anything and everything from the arrested person that for reasonable administrative purposes they do not want introduced into the jail. ORS 142.210;[2] *State v. Whitewater,* 251 Or 304, 445 P2d 594 (1968); *State v. Kangiser,* 8 Or App 368, 494 P2d 450 (1972); *State v. Sorgenfrei,* 7 Or App 442, 490 P2d 1040 (1971), Sup Ct *review denied* (1972); *State v. Riner,* 6 Or App 72, 485 P2d 1234, Sup Ct *review denied* (1971); *cf., State v. Swarts-*

---

[2] ORS 142.210 provides:

"Whenever any jailer, peace officer or health officer takes or receives any money or other valuables from any prisoner or person in custody for safekeeping or for other purposes, the officer or jailer receiving such valuables or money forthwith shall tender one of duplicate receipts for the property being surrendered to the prisoner or person in custody. If possible, the prisoner or person in custody shall countersign both the original and duplicate receipts. If the prisoner or person is unable to sign the receipts or receive the duplicate thereof, the same shall be signed by and delivered to the prisoner or person when reasonably possible. A file of the original receipts shall be kept for at least six months after the money or valuables have been returned to the prisoner, his agent or representative or other person entitled to the same."

*fager,* 11 Or App 69, 501 P2d 1321 (1972); *State v. Darrien,* 10 Or App 84, 497 P2d 1204, Sup Ct *review denied* (1972).

In *State v. Whitewater,* supra, defendant was arrested on a variety of serious traffic charges. While he was being booked in at the county jail, officers noticed that defendant's boots appeared to be capable of making impressions similar to ones that had been observed at the scene of recent burglaries. Defendant was required to surrender his boots to the jailer as part of the booking procedures, and an officer then seized them and sent them to the crime laboratory. In defendant's subsequent burglary trial the boots and the crime laboratory test results linking the boots to the impressions at the burglary scenes were introduced in evidence. The Supreme Court held the seizure of the boots was lawful:

> "* * * There was only a seizure [upon probable cause] and no search was ever made. ORS 142.210 requires a prisoner when booked to turn over to the jailer his possessions." 251 Or at 307.

## B

But the conceded prerogative of jail officials to *take* defendant's wallet from him does not necessarily create the additional authority to *search* the wallet. Does this additional authority exist?

The state argues the search is valid based on language in our prior decisions in *State v. Kangiser,* supra, *State v. Sorgenfrei,* supra, *State v. Riner,* supra, *State v. Swartsfager,* supra, and *State v. Darrien,* supra. While those cases may well have been properly decided on their facts, we now conclude that the broad language upon which the state relies can no longer be

followed in light of the Oregon Supreme Court's recent decision in *State v. Keller,* — Or —, 510 P2d 568 (1973).

In *Keller,* the defendant was arrested for driving with a suspended license and taken into custody. Before having the defendant's car towed from the scene of the arrest, the police conducted an inventory search of the contents of the car. In the course of this inventory the police seized narcotics paraphernalia that was in plain view in an open cosmetic case, and narcotics that were in a tackle box that had been closed before the police opened it. In striking "a delicate balance between conflicting public and private interests—the need to search to protect law officers and car owners and the invasion of Fourth Amendment protected interests of private citizens,"[9] the Oregon Supreme Court held: (1) the police could enter the car for purposes of making the inventory search; (2) evidence of crime that comes into plain view of the inventorying officers is subject to seizure, i.e., the seizure of the narcotics paraphernalia from the cosmetic case was proper; and (3) during the course of an inventory officers may not open closed containers; thus, the seizure of the narcotics from the closed tackle box was invalid.

*Keller* involved an inventory search of an automobile taken into police custody at the time of an arrest. This case involves an inventory search of a person's possession taken into police custody at the time of an arrest. We perceive no meaningful distinction between these two situations. In both situations, the fact that an arrest has occurred creates an obligation that the police hold certain property for safekeeping—be it a tackle box from a car, as in *Keller,*

---

[9] State v. Keller, 265 Or 622, 629, 510 P2d 568 (1973).

or a person's wallet, as in this case. However, in both situations, the fact that an arrest has occurred does not destroy the arrestee's reasonable expectation of privacy, i.e., that tackle boxes and wallets will not be subject to indiscriminate examination by the police.

> "We are not prepared to say that an accused whose effects are held by the police for safekeeping has, by the single fact alone of the police custody of the property, surrendered his expectations of the privacy of those effects." *Brett v. United States,* 412 F2d 401, 406 (5th Cir 1969).

■ We hold the *Keller* rules apply to a booking search. (1) The jailer can require an arrested person to surrender his property. (2) Items that the jailer sees in plain view and which he has probable cause to believe are contraband or evidence of crime are subject to seizure. (3) As part of a booking search or inventory, a jailer cannot open closed containers taken from the arrestee.

It is often argued that if the police are not authorized to inventory the items in a wallet or other closed container they will be open to unfounded charges of theft. It is true that if such containers are safely secured without such an examination those charges may arise. However, we know of no reasonable method by which the police would always be protected against a charge of having stolen money while in the process of counting it.

■ We further hold that defendant's wallet was a closed container within the meaning of *Keller.* The notion of a "closed" container relates to whether the contents are or are not exposed to public view, which in turn relates to whether there is expectation that the contents of the container will remain private. *Brett v.*

*United States,* supra. The contents of a wallet are not ordinarily exposed to public view; the owner of a wallet does have a reasonable expectation that what is in his wallet will remain private. *Cf., State v. Childers,* 13 Or App 622, 511 P2d 447, Sup Ct *review denied* (1973).

The search of defendant's wallet cannot be sustained as part of a booking search or inventory.

## C

■ But even assuming that defendant's wallet could have been opened and searched, were the drugs in it subject to seizure? We hold they were not.

As noted above, *see,* Part II (C), *State v. Elkins,* supra, requires that the police have probable cause to believe an item is contraband before they can seize it. In *Elkins* the search and seizure took place on the street incident to an arrest. In this case, the search of the wallet and seizure of the drugs took place at the station house. In *Elkins* the court suggested this distinction might produce a different result:

> "* * * It may well be that after a person has been deprived of the possession of his property upon being incarcerated, he may not thereafter complain if police have his property examined. His property rights have already been legally violated. However that is not a question we must decide now as this situation had not yet occurred and might never have occurred." 245 Or at 291-92.

We conclude that the more recent decision in *State v. Keller,* supra, compels the conclusion that the distinction between the facts in *Elkins* and in the case at bar does not produce a different result, that is, that

the *Elkins* requirement that the police have probable cause to make a seizure applies equally in the station house and on the street. The *Keller* defendant was deprived of the possession of her property, i.e., car and tackle box, upon being incarcerated. To this extent, her property rights were legally violated. However, rather than concluding that she could not thereafter complain if the police had her property examined, the Supreme Court instead concluded that the *Keller* defendant could complain about the police having opened her tackle box during an inventory of the contents of her car. Given that the *Keller* defendant can and did successfully complain about the search of her tackle box, we can perceive no basis for holding that the defendant in this case cannot also complain about the opening of his wallet and the seizure of the substances in it for chemical analysis.

As stated in Part II (C), supra, the record in this case does not furnish any basis for concluding that the police had probable cause to believe the substances in defendant's wallet were illegal drugs.

## IV

The state's final contention to support the search of defendant's wallet is that in light of defendant's refusal to answer its questions about name, address, etc., it was necessary to search through the wallet in order to find this information needed for various reports. The record contains no explanation of the nature of these reports or their importance. The record does contain testimony from which we infer the police had previously obtained all or most of the information needed for their reports during their earlier contact with defendant.

*State v. O'Neal*, 251 Or 163, 444 P2d 951 (1968), holds:

> "The state concedes that not every traffic violation with an ensuing arrest would authorize a search; however, it contends that in this case, because of the nature of the charges, a question of identity arose and the officers had the right to attempt to find out by searching the driver's wallet who the accused was. The driver's identity has no relationship to the charges against him; the driver's conduct in the particulars charged are law violations regardless of who he is." 251 Or at 167.

A strong argument can be made that the police should be able to take such steps as are reasonably necessary to identify a person whom they are going to hold in a cell pending judicial proceedings, and that *O'Neal* should not be construed to apply in such a situation. However, we need not reach that question here in view of our holding that even if the wallet could have been opened and searched, the powder found in it was not subject to seizure for analysis.

Reversed and remanded.

FORT, J., dissenting.

Defendant, convicted by a jury of three counts of criminal activity in drugs, ORS 167.207, appeals, assigning as sole error the denial of his motion to suppress certain evidence taken from his wallet following his arrest on unrelated felony charges. A brief statement of the facts is necessary for a determination of the issue.

On February 5, 1973, Deputy Sheriff Lynn Forristahl approached defendant, who was at work outdoors on his father's berry farm. The officer advised

defendant of his *Miranda*[①] rights and asked him questions regarding a recent burglary. Defendant thereupon entered a nearby housing unit and carried out several items which had been reported stolen from a home. The officer asked him if he had the television set that had been taken in the burglary. Defendant said he had sold it, but that he thought he could get it back.

Subsequently, while the investigation of the burglary continued, the officer prepared a report[②] which indicated that on February 5 the defendant was living at a migrant farm labor camp located on his father's berry farm.

On February 14, 1973, Officer Forristahl, accompanied by another deputy sheriff, returned to the berry farm to find out if defendant had recovered the stolen television set. The officers parked next to a fence and Forristahl questioned defendant, who was working on its other side. Defendant started yelling and screaming profanities and said, "I don't intend to get it back. I don't have to get it back." The officer then said, "You're under arrest for burglary." Defendant started walking away. The officer jumped the fence, whereupon defendant turned around with a

---

[①] Miranda v. Arizona, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966).

[②] The report is not in evidence. Indeed, for reasons which nowhere appear in the record, none of the eight exhibits which were marked at the hearing, the subject of extensive examination by both counsel and obviously considered by the court, were offered or received in evidence. Thus, none of this material is a part of the record on appeal. Furthermore, documents used by the defendant were not marked nor their content adequately explained. No objection to such procedures was made by either party. Indeed, each actively participated therein. When a party relies on documentary evidence in support of his position and uses it in cross-examination of witnesses, it is his duty to see that it is made a part of the record.

pitchfork in his hands and thrust it at the officer. The officer pushed it aside, subdued and handcuffed defendant. He then again informed the defendant of his *Miranda* rights.

The officer next searched the defendant. He removed defendant's red stocking hat, placed it on the hood of the patrol car, and then removed a pipe, a pair of gloves, a pocketknife, a box of candy and a wallet from defendant's pockets and placed them in the hat. Defendant's mother had by then walked to the scene and attempted to take the contents of the hat but was directed by the officer not to do so. No search of the wallet was made there, and the hat with its contents was put in the front seat of the patrol car, the defendant having been put in the back.

Defendant was then transported to the city hall at Estacada en route to jail. There he was asked to state his name, address, date of birth, social security number, occupation and employer in connection with the preparation by the officer of the customary custody report. Defendant refused to answer any question or to say anything. The officer testified he then flipped open the defendant's wallet, expecting to obtain the desired information from the defendant's driver's license. As the officer flipped open the wallet to locate the license, he saw several small plastic bags in plain view "just inside the billfold," protruding from a compartment. Upon further observation, he saw that five of these contained a white substance and a sixth contained a blue substance. The officer asked defendant if he was taking any medication. The defendant continued to refuse to answer. Shortly thereafter, defendant was transported the remaining distance to the county jail.

The officer suspected the contents of these bags were narcotics, and, subsequently, had them and the pipe delivered to the county narcotics detective who determined that the former contained dangerous drugs, and that the latter contained marihuana residue. The motion seeks the suppression of all the seized drugs and their containers.

Defendant's principal contention is that, since the officer testified he had previously obtained the defendant's name, address, place of employment, etc., at the February 5 incident, he did not have a valid reason to look into the wallet for that information. Since the defendant had been arrested for a felony, a search of the wallet contents at the time of booking him into jail would be valid under *State v. Sorgenfrei,* 7 Or App 442, 444, 490 P2d 1040 (1971), Sup Ct *review denied* (1972), and *State v. Kangiser,* 8 Or App 368, 372, 494 P2d 450 (1972), had it been done for inventory purposes. But he contends that here it was not done for that purpose but solely to obtain identification data which the officer had already previously obtained.

Defendant relies particularly upon *State v. Keller,* 265 Or 622, 510 P2d 568 (1973). That case upheld as valid a warrantless inventory search of an impounded automobile as long as it was confined to material in plain view within the vehicle, but held invalid, as unnecessary to such inventory, the search of the contents of a fishing tackle box tied with red wire.

The court said:

"In a close case of a warrantless search and impoundment of an automobile there is a delicate balance between conflicting public and private in-

terests—the need to search to protect law officers and car owners and the invasion of Fourth Amendment protected interests of private citizens. We recognize that there may be exigent circumstances but none are present in the case at bar. After finding the partially opened cosmetic case with syringes and needles in plain view, a search warrant could have been obtained from a disinterested magistrate on probable cause. The opening and searching of the closed fishing tackle box was an unreasonable search violative of defendant's federal Fourth Amendment and Oregon Article I, Section 9, constitutional rights." 265 Or at 629.

*See also, State v. Childers,* 13 Or App 622, 511 P2d 447, Sup Ct *review denied* (1973).

In the case at bar, the wallet had already been validly seized in a lawful search of his person by the police immediately following the defendant's arrest for burglary. The defendant had at that time also threatened the officer in anger, with a pitchfork. His arrest was clearly lawful. The officer had ample probable cause to arrest both for burglary and the alleged assault. *State v. Jones,* 248 Or 428, 432, 435 P2d 317 (1967).

The defendant's wallet was not searched incident to his arrest, as in *State v. Keller,* supra, and *State v. O'Neal,* infra. It was not "flipped open" as part of an inventory search but later, solely in connection with defendant's identification. It, together with his other personal belongings, was simply removed from him pending his transportation and booking into jail, and at a time when he was strongly resisting arrest.

When the defendant, during the preparation of the custody report at the city hall, refused to answer any questions or furnish any information to the officer, I think it reasonable that the officer sought to

examine his driver's license in his wallet, whether to verify or to supplement data he had received some days before, as here, or as an original investigation necessary to the booking-in procedure. No improper search of the content of the wallet was here made, since the contraband was in plain view the instant the wallet was flipped open. Unlike *Keller* and *Childers,* the opening of the wallet was no part of an investigation related to the discovery of contraband. Here, none was suspected at all. The court concluded the opening of the wallet was done solely in aid of identification and the preparation of the usual custody report made following a lawful arrest. Defendant had alreay been transported to the Estacada City Hall. The preparation of the custodial report by the officer during the stop at the city hall while en route to, rather than at, the county jail does not, in my view, here invalidate the plain view discovery of the contraband within the wallet. It was not part of an inventory search such as was condemned in *Keller* and *Childers.* There is ample evidence to support this conclusion.

The majority concludes that *State v. O'Neal,* 251 Or 163, 444 P2d 951 (1968), is controlling here. That case involved the search of a wallet following a traffic arrest. There the officer pulled a paper out of the wallet of an apparently cooperative traffic violator, and a half-smoked marihuana cigarette fell out of the paper which the officer without defendant's consent unfolded. Here the contraband was in plain view when the wallet was flipped open to ascertain[9] relevant

---

[9] Concerning the opening of the billfold, the officer testified:
"Q. [by prosecuting attorney] Did you get any response from him to the questions?
"A. None of any kind.

identification information necessary to complete administrative booking procedures.④ The defendant had refused to furnish any of such data. The officer

"Q What happened after that?

"A I had his billfold and so I seen he wouldn't answer my questions and I supposed he should have a driver's license in his billfold and I opened his billfold and he carried in the back, so I —

"Q What was your purpose in looking at the billfold?

"A To obtain his identity, his true identity, his date of birth, social security number, if he had a card showing his correct address, numerous things that we needed for the custody report.

"Q Did you find any of those things in the billfold?

"A Yes. I found his date of birth on a driver's license. I didn't find the social security card.

"Q Was there anything else in the billfold besides the card that you mentioned?

"A Yes. There was some plastic, little, small, plastic bags.

"Q And where were they located in the billfold?

"A Right at the front. As soon as I opened it up I could see these plastic bags just inside the billfold. * * *"

④ That there was substantial confusion concerning the accuracy of the data contained in the police report following the February 5 incident referred to in the court's opinion is shown by the following testimony elicited on cross-examination:

"Q [by defendant's attorney] Officer, these apparently are two reports written in your handwriting regarding the investigation of the burglary, is that correct?

"A Yes, sir. Um-hum.

"Q And those reports reflect the facts that you already knew Mr. Florance, you already knew his date of birth. Is that not correct?

"A This — yes, this would reflect to this, yes.

"Q Now, those were written subsequent to the time that you had originally contacted the defendant on February 5, is that correct?

"A This was on this report, yes. Um-hum.

"Q Okay.

"A This address here is not his correct address. This is the — this address here he was at another address in Portland. This here is an address of an Oregon City address, or a Portland address, another man in Oregon City's address."

earlier had taken possession of the wallet and the pipe at the time of the arrest and before defendant was transported to the city hall. I think the act of the officer in flipping open the wallet not at all in an exploratory search for evidence of a crime but to obtain routine information requisite to customary administrative booking-in procedures was reasonable, particularly when the defendant refused to furnish any such data. *See, State v. McCoy,* 249 Or 160, 437 P2d 734 (1968); *State v. Whitlow,* 13 Or App 607, 510 P2d 1354, Sup Ct *review denied* (1973).

Since the baggies were in plain view the moment the wallet was flipped open for what I believe to have been lawful reasons, it follows in my view that under the plain view doctrine it was the right and indeed the duty of the officer not only to remove the baggies from the wallet but to have them subjected to analysis. Accordingly, I would affirm.

For the foregoing reasons, I respectfully dissent.