Argued January 25, reversed and remanded May 28, 1974

## STATE OF OREGON, *Respondent, v.* LYNN ALAN HOLMES (No. 73 1175), *Appellant.*

522 P2d 900

*J. Marvin Kuhn,* Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

*W. Michael Gillette,* Solicitor General, Salem, argued the cause for respondent. With him on the brief was Lee Johnson, Attorney General, Salem.

Before Schwab, Chief Judge, and Fort and Tanzer, Judges.

TANZER, J.

Defendant was charged with two counts of criminal activity in drugs. ORS 167.207. Count I of the indictment alleged knowing and unlawful possession of amphetamine, and Count II alleged knowing and unlawful possession of less than one ounce of marijuana. Following a verdict of guilty on both counts, defendant

was sentenced to three years' imprisonment on Count I and sixty days' imprisonment (suspended for one year) on Count II.

The facts are that Officer Egeter of the Springfield Police Department was responding to a call when he observed defendant and two companions standing near an automobile. Officer Egeter saw that defendant was holding a bottle of wine in his hand and knew from prior information that defendant was under 21 years of age. Defendant walked toward the police car, holding the wine bottle out as if to show the officer what he had. As Officer Egeter got out of his car and approached defendant, defendant's facial expression changed from a "half smile" to "a concerned look, a worried look." Defendant turned and walked toward one of his companions, Becky Miller. As he did so, he moved his hand to the area of his left shirt pocket and then held out the closed hand toward Miss Miller. Miss Miller placed her hand under defendant's outstretched hand and appeared to Officer Egeter to receive something from defendant. She then put her closed hand into her coat pocket and kept it there.

Miss Miller started to walk away from Officer Egeter, but Officer Egeter motioned her and defendant to come to the police car. As they approached, she appeared to Officer Egeter to be "fearful or concerned or upset to some degree." He asked her to remove her hands from her coat pockets.

Officer Egeter arrested defendant for being a minor in possession of alcohol, told him to remain where he was, and then turned his attention to Miss Miller. He advised her of her constitutional rights and asked her what defendant had transferred to her. She

responded that nothing had been transferred. Officer Egeter noticed a bulge in her pocket and, in response, she removed keys and other articles and showed them to Officer Egeter. Officer Egeter advised her that, despite the removal of those items, a bulge still remained. He asked to see what was in her pocket, and she told him to "go ahead." Officer Egeter then reached into her pocket and removed a small plastic vial containing small white cross-grooved pills, a small plastic bag containing more pills, and a small vial holding some powder. Officer Egeter recognized the cross-grooved pills as identical to amphetamine pills which he had seen in the past. Miss Miller was placed under arrest for criminal activity in drugs.

Officer Egeter then turned his attention back to defendant and told him to take a spread-eagle position on the patrol car. In the course of a pat-down search, Officer Egeter removed a film canister from defendant's right front pants pocket. He looked inside the container, observed that it contained what he believed to be marijuana, and then handcuffed defendant. Officer Egeter continued to search defendant, and found some cigarette papers and a glass vial containing a small amount of white residue in the shirt pocket toward which defendant had reached earlier. The vial was identical to those found in Miss Miller's pocket.

Defendant was then arrested for criminal activity in drugs, too, and transported to the police station. At the police station's book-in room, an itemized check of the items in defendant's possession was made. During this check, which Officer Egeter testified was standard department procedure, a rolled marijuana cigarette was found in defendant's billfold.

The marijuana cigarette found in defendant's wallet, the items found in Miss Miller's pocket (which proved to contain amphetamine), the film canister of marijuana, and the vial found in defendant's shirt pocket (which also contained amphetamine) were all introduced into evidence.

Defendant assigns as error the trial court's denial of his motion to suppress the items seized from him.

Defendant's only arguments of substance are that the marijuana discovered in the closed film container and in his wallet were improperly seized. In so arguing, he places primary reliance on *State v. Florance,* 15 Or App 118, 515 P2d 195, *rev allowed* (1974), where this court, among other grounds, extended the "closed container" principle of *State v. Keller,* 265 Or 622, 510 P2d 568 (1973), an automobile search case, to searches of the person.

The state responds (1) that *Florance* is distinguishable from the facts at bar or, in the alternative, (2) that *Florance* was wrongly decided and should be overruled in favor of the recent holdings of the United States Supreme Court in *United States v. Robinson,* 414 US 218, 94 S Ct 467, 38 L Ed 2d 427 (1973), and *Gustafson v. Florida,* 414 US 260, 94 S Ct 488, 38 L Ed 2d 456 (1973). Because we agree with the state that the instant situation is different from *Florance,* we need not reach either the question of the continuing validity of *Florance* or the question of whether the holdings of *Robinson* and *Gustafson,* under which the instant search would clearly be valid, should be the law in Oregon.

■ At the hearing on the motion to suppress in this case, Officer Egeter characterized the search of de-

fendant's person at the police station as an "inventory search." Defendant is correct in his assertion that, under *Florance,* the search cannot be upheld on that theory. However, the permissibility of the intrusion does not depend upon the label placed upon it by police personnel. *Cf. Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968); *State v. Cloman,* 254 Or 1, 12, 456 P2d 67 (1969). The question is one of reasonableness.

■■ Oregon law at least allows an arresting officer to search an arrestee incident to his arrest for self-protection, to prevent escape and to prevent the destruction of evidence, so long as the search is "reasonably related to the offense." *State v. O'Neal,* 251 Or 163, 444 P2d 951 (1968); *State v. Krogness,* 238 Or 135, 388 P2d 120, *cert den* 377 US 992 (1964); *State v. Chinn,* 231 Or 259, 373 P2d 392 (1962). If the search is to extend beyond looking for weapons and means of escape, the offense for which the arrest is made must be an offense for which there can be evidence, and the officer must search only in places where such evidence might reasonably be concealed. It is the difference in the nature of the crime and the resultant difference in the permissible degree of intensity of the search which distinguishes this case from *State v. Florance,* supra.

Florance was arrested for menacing. The only evidence of the crime was a pitchfork which was incapable of concealment within a wallet. There being no evidence to search for, the police were limited to a search for weapons and for a possible means of escape. Nevertheless, when the officers and Florance arrived at the police station, the officers opened Florance's wallet (which they had earlier seized from him) and

found several plastic bags which later proved to contain drugs.

■ In the case at bar, by contract to the *Florance* situation, defendant was arrested for criminal activity in drugs. Evidence of this particular crime is readily concealable within such small containers as film canisters and wallets, and the appellate decisions of this state indicate that a wallet can reasonably be expected to be a place for concealment of narcotics. *See,* e.g., *State v. O'Neal,* supra; *State v. Florance,* supra. Officer Egeter was entitled to search for narcotics in any place where such contraband might reasonably be concealed. The film canister and wallet were both such places. Thus, the intrusions were of reasonable intensity as incident to defendant's arrest for a drug offense.

Defendant argues that even if the wallet could have been searched incident to arrest at the place and time of arrest, the fact that the search was not made until later at the police station invalidated the search. In so arguing, defendant relies heavily upon the following language in *State v. Florance,* supra:

"Was the subsequent search of the wallet at the Estacada City Hall valid? This search occurred sometime after the arrest (the record does not disclose how long), some distance from the scene of the arrest (the record does not disclose how far). This search of the wallet clearly cannot be justified as being incident to defendant's arrest.

" 'The search must be an incident of the arrest, i.e., close to the arrest in time and space * * *.' *State v. Chinn,* supra, 231 Or at 267. Or, stated differently, '[O]nce an accused is under arrest and in custody, then a search made at another place * * * is simply not incident to the arrest.' *Preston*

*v. United States,* 376 US 364, 367, 84 S Ct 881, 11 L Ed 2d 777 (1964).

" 'The very notion of a search *incident* to an arrest connotes spatial contiguity and temporal proximity. To hold otherwise would eliminate all pretense of a rational nexus between the search and the arrest and would be tantamount to saying that an individual legally arrested thereby forfeits all protection under the fourth amendment * * *.' Cook, *Warrantless Searches Incident to Arrest,* 24 Ala L Rev 607, 608 (1972).

"In this case, either the search of defendant's wallet was too remote in time and place to be part of a search incident to arrest, or at the very least it cannot be said that the state sustained its burden of proving a reasonably contemporaneous search under the circumstances of this case."

The quoted language purported to literally apply the words of *Preston,* an automobile case, and *Chinn,* a premises case, to searches of the person. There is, however, a well-established post-*Preston* recognition that a search of an automobile incident to arrest may be continued at a later time in a different place under better conditions for a thorough search. *Chambers v. Maroney,* 399 US 42, 90 S Ct 1975, 26 L Ed 2d 419 (1970); *State v. McCoy,* 249 Or 160, 437 P2d 734 (1968); *State v. Diaz,* 3 Or App 498, 503-504, 473 P2d 675, *rev den* (1970); *State v. Keith,* 2 Or App 133, 465 P2d 724, *rev den* (1970). The rule allowing continuation of a search of a car is all the more reasonable as applied to searches of persons because, among other reasons, we accord a higher degree of dignity to the person than we do to inanimate objects. A leading commentator has pointed out with approval that courts "have not expressed concern over delay

in those cases which merely involve search of the person of the one arrested:

> "Such a result is certainly proper, and this is so without regard to what one may think about the delayed search of premises or automobiles. The passage of time does not really disconnect the search from the arrest, as the search is of the person who continues to be in police custody. Moreover, it is apparent that the justification for search of the person continues as long as that individual remains in custody. Indeed, reasonable police conduct would call for resort to certain kinds of searches (such as the so-called 'strip search' or search of body cavities) only in the privacy of the station. And finally, in view of the long-recognized right of the police to inventory the suspect's belongings at the station, the limitation of search of the person incident to arrest to the very time of arrest would have little significance." LaFave, "Search and Seizure: The Course of True Law * * * has not * * * run Smooth," 1966 Ill. Law Forum 255, 304.

■ Therefore, a search and seizure of the person which could have been made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention, *Abel v. United States,* 362 US 217, 239, 80 S Ct 683, 4 L Ed 2d 668 (1960), or even sometime after his arrival at the police station, *United States v. Edwards,* 415 US 800, 94 S Ct 1234, 39 L Ed 2d 771 (1974). We have been referred to no Oregon case holding to the contrary. We therefore conclude that a search which would be valid as incident to arrest if carried out at the point of arrest is not invalidated solely because the search is continued upon arrival at the police station. To the extent that language in *State v. Florance,* supra, expresses a contrary view, we abandon that language.

It might be argued that the theory of delayed or continued search incident to arrest is a fiction and that the reality is better conceptualized in *United States v. Robinson,* supra, and *Gustafson v. Florida,* supra, which hold that the search of a person in custody is per se reasonable and that the evidence-weapons-means of escape limitation does not apply to searches of the person. The Oregon Supreme Court may or may not accept that construction of the Fourth Amendment by the United States Supreme Court. It has in the past acknowledged the supremacy of that court in matters of federal constitutional law and has declined to interpret the search and seizure provisions of the Oregon Constitution inconsistently. *See,* e.g., *State v. Keller,* supra; *State v. Blackburn/Barber,* 266 Or 28, 511 P2d 381 (1973); *State v. Hawkins,* 255 Or 39, 463 P2d 858 (1970); *State v. McCoy,* supra; *State v. Elkins,* 245 Or 279, 422 P2d 250 (1966); *State v. Krogness,* supra; *State v. Chinn,* supra; *State v. Laundy,* 103 Or 443, 204 P 958, 206 P 290 (1922). Either way, however, *Robinson* and *Gustafson* help illustrate the historical analytical problems of searches incident to arrest.

The fiction, if any, is caused by our choice of words. It does not inhere in the concept. Under *Robinson* and *Gustafson,* at a minimum, the concept of search incident to arrest might better be called search incident to custody. That search which is constitutionally reasonable at the commencement of a period of custody is no less reasonable at any later stage of custody and the permissible scope of such a search does not diminish with the passage of time.

Furthermore, the evidence-weapons-means of escape limitation on searches of the person is clearly one

of theory which is so seldom an actual limitation as to be a nullity. A limitation which allows a search of body cavities for drugs, *see,* e.g., *People v. Jones,* 20 Cal App 3d 201, 97 Cal Rptr 492 (1971), and cases cited therein, is a limitation of more benefit to scholars than to arrested persons. Thus the conceptual shift of *Robinson-Gustafson* is not a change in reality.

The search in this case is clearly valid as incident to arrest and custody and is within whatever standard of permissible intensity as may be applicable. While it may also be sustained as a probable cause warrantless search, *cf. State v. Murphy,* 2 Or App 251, 465 P2d 900, *rev den, cert den* 400 US 944, 91 S Ct 246, 27 L Ed 2d 248 (1970), we need not discuss that theory in light of our disposition. The fruits of the search were properly admitted as evidence.

Defendant's second assignment of error is that the trial court erred in denying his motion for a judgment of acquittal on Count I of the indictment which charged him with possession of amphetamine.

The jury could have reasonably inferred that the amphetamine tablets found on Miss Miller were the subject of the exchange witnessed by Officer Egeter. Among the circumstances tending to support such an inference were the furtiveness of the movement itself and the changes in defendant's expression.

Defendant contended that he had passed money to Miss Miller, but this contention was undercut by the fact that defendant's motion had been to his shirt pocket, whereas his wallet was in his hip pocket, and the fact that when Officer Egeter asked Miss Miller what had been transferred, she said "nothing." The jury was entitled to infer from these circumstances that defendant had in fact transferred contraband.

Finally, the jury was entitled to draw an appropriate inference from the fact that the vial found on defendant was identical to the vial containing amphetamine tablets found on Miss Miller. While the trial court ruled that the residue contained in the vial found on defendant was not alone sufficient to establish the charge of possession of amphetamine, it did not exclude the vial from evidence. The jury was free to draw a common-sense conclusion from these circumstances.

■■ Upon a motion for judgment of acquittal, the evidence is to be viewed in the light most favorable to the state. *State v. Nix,* 7 Or App 383, 491 P2d 635 (1971). Viewed in that perspective, defendant's motion was properly denied.

Next, while the jury was engaged in their deliberations, they requested a dictionary and the court provided it over the objection of both attorneys.① Defendant assigns the furnishing of the dictionary as error.

---

① "THE COURT: Now, a few minutes ago, as counsel know, the jury sent a request out for a dictionary. Not a law dictionary, but an ordinary dictionary of the English language. I mentioned it to counsel and each of you expressed some opposition to the idea, and I nevertheless sent the dictionary in to the jury room, and I'll give you an opportunity now before the jury returns their verdict to take exception.

"MR. TEISING (defense counsel): Yes, in behalf of the defendant, Your Honor, I take exception to that. The request was an oral request as I understand it, and there was no specificity regarding the purpose for the dictionary or what was to be accomplished by its use.

"Both counsel for the State and myself requested that that not be done, and, because there was no specific request regarding any reason for the use of the dictionary, and because it's possible, in my view, that they could have looked at the definition of words such as the term 'circumstantial evidence', that are contained in the dictionary, and use that and perhaps stray from the

■ The court's action in providing the jury with a dictionary was error. *Cf.* Anno., Use of Books in Jury Room, 54 ALR2d 738 (1957). Where counsel made a timely objection and pointed out the improper uses to which a dictionary could be put and the court furnished the dictionary for speculative reasons and without inquiry as to the jury's need, we must assume that prejudice flowed from the injection of unauthorized informational and definitional material into the jury deliberations.

Reversed and remanded.

SCHWAB, C. J., specially concurring.

I concur in the majority opinion, but wish to note that as to the search and seizure issue my concurrence in the result should not be construed to indicate that I concur fully in the reasoning that led to it. See my concurring opinion in *State v. Williams,* 17 Or App 513, 522 P2d 1213 (1974). In my opinion, the search in the case at bar turned simply on the point that the events which took place at the time of the defendant's apprehension gave the police probable cause to believe that defendant then had drugs on his person.

---

court's instruction, I would take exception to the granting and placing the dictionary with them for their use.

"MR. KILMER (prosecutor): The record should reflect that the State has no formal objections.

"THE COURT: Fine.

"I might say for the record I was motivated by the fact the jury had the indictment and had several exhibits that were written documents, and they had, for example, the officer's report without objection, and it could be any number of reasons why they might want to have recourse to a dictionary of the English language to clarify the meaning of a word or perhaps a word that was used by a witness in this testimony. It seemed like a legitimate request."

FORT, J., specially concurring.

I concur with the court's holding that it was reversible error for the trial court, over the objection of both counsel, to have sent the dictionary to the jury room during the jury's deliberations.

Based in part upon my dissent in *State v. Florance,* 15 Or App 118, 515 P2d 195 (1973), Sup Ct *review allowed* (1974), and in part because I do not consider it necessary to reach the other issues discussed in the court's opinion, I decline to join therein. Since *State v. Florance,* supra, is now on review before the Supreme Court it seems to me to be inappropriate to speculate upon what the action of the Supreme Court therein may be.