Argued and submitted July 18, reversed and
remanded October 13, reconsideration denied November 20, 1980,
petition for review allowed February 4, 1981

CREASEY,
*Respondent,*
*v.*
HOGAN,
*Appellant,*

(No. 77-3743, CA 14498)

617 P2d 1377

Richard W. Butler, Eugene, argued the cause for appellant. With him on the briefs were George A. Burgott and Thwing, Atherly & Butler, Eugene.

William F. Frye, Eugene, argued the cause for respondent. With him on the brief was Frye, Smith & Franz, Eugene.

Before Richardson, Presiding Judge, and Thornton and Buttler, Judges.

RICHARDSON, P.J.

## RICHARDSON, P.J.

The defendant in this malpractice action appeals from a judgment awarding damages to plaintiff for injuries she allegedly suffered as a result of surgery performed by defendant. We reverse and remand.

Defendant is a podiatrist, whom plaintiff consulted in July, 1976, complaining of bunions on both feet. In August of that year, defendant performed surgery at the Valley Lane Hospital in Eugene to correct the problem. After the surgery, the great toe on plaintiff's right foot was shortened, deficient in mobility, and angled downward in what was described by one of the expert witnesses as a plantar-flexion deformity. Plaintiff's post-surgical complications affecting her left great toe included hallux varus (a condition in which the great toe drifts in the direction of the medial side of the foot), a cockup deformity, impaired motion, and displacement of the sesamoid bone at the bottom of the toe.

Plaintiff contended that these conditions were caused by defendant's negligent performance of the surgery and by his failure to take post-operative x-rays to assure that the bones were stable and properly placed. She also contends that defendant failed to advise her of material risks of the surgery and of available alternative therapeutic procedures, and that he therefore operated without plaintiff's informed consent.

The first of defendant's 41 assignments of error is that the trial court erred by reading the jury a medical dictionary definition of the word "transverse," in response to the jurors' request during their deliberations for a definition of the term "transverse plane osteotomy." That term was used in defendant's operative record to describe the procedure he performed on plaintiff's right great toe. The definition of "transverse" which the court read to the jury was "placed crosswise; situated at right angles to the long axis of a part."

Defendant testified that he performed an Austin bunionectomy on plaintiff's right foot. The principal characteristic of that procedure is that the incision into the bone is in the shape of a sideways letter V. Defendant contended that this type of cut and the procedures performed incident to it have the inherent virtue of leaving the bones stable, and that it is unnecessary to take post-operative x-rays to assure proper bone position when the Austin cut is used.

However, plaintiff's attorney stated in his closing argument to the jury:

"In these hospital records that are in evidence, you can go through them page by page. There is no mention of the Austin bunionectomy at all, no such mention. As a matter of fact, the operative report that Dr. Hogan made out doesn't mention this Austin bunionectomy. Remember how it was drawn up here like this? I'll tell you why I think that might be important to the defendant's case in a moment. How did he describe it in here? He didn't give it that way. He calls it a transverse plane osteotomy. Our experts don't know, either. They weren't at the operation so they don't know what kind of cutting was done. All we can go by is what is in the medical reports here. It would be a lot easier for them to argue to you people about the impossibility of a shift in this metatarsal head if they could say look what we did, we cut this thing in such a fashion that it couldn't move at all. That is more convincing than just cutting it in two."

There was conflicting evidence about whether the Austin procedure has the stabilizing and other virtues defendant ascribed to it. However, there was no evidence that defendant had not performed the Austin procedure rather than some other or had not made the V-shaped incision he testified he did. The operative record did not use the words "Austin bunionectomy," and did use the words "transverse plane osteotomy." But nothing about the latter term or the context in which it appears can suggest — at least to laymen — that the term is inconsistent with the Austin procedure having been performed, or that "transverse plane osteotomy" describes a type of incision rather than some other aspect of the surgical

treatment. No evidence about the meaning of the term was produced by either party. Plaintiff's closing argument provided the jury with its first suggestion that the meaning of "transverse plane osteotomy" was an issue in the case.

Against that background, defendant argues that the court's reading of the definition of "transverse" to the jury in effect supplemented the evidence which the parties had presented regarding the nature of the procedure defendant performed. According to defendant, he was prejudiced by the reading of the definition because the jury could have inferred from it, as plaintiff's closing argument had insinuated, that a cut "at right angles to the long axis of a part" means an incision straight across the bone rather than one which follows a V pattern. Plaintiff responds that the term "transverse plane osteotomy" was used by defendant in the operative record, which was in evidence, and that it was proper for the court to read the definition of "transverse" which, in plaintiff's view, is "a word of ordinary meaning" and "not uniquely a medical term."[1]

The parties variously rely on or seek to distinguish *State v. Holmes,* 17 Or App 464, 522 P2d 900 (1974), and *State v. Cummings,* 33 Or App 265, 576 P2d 36 (1978). Neither *Holmes, Cummings,* nor any other authority the parties cite or we find is entirely apposite. The issue here is not whether it was proper for a jury to have access to a dictionary but whether the trial court erred in giving the jury what amounted

---

[1] Plaintiff also argues that there is no inconsistency between the definition read by the court, even if understood by the jury as meaning a cut going through the bone, and the V-cut which defendant testified he made. Defendant did testify that the V-cut does pass all the way through the bone. However, plaintiff's present argument is difficult to reconcile with the clear implication in her jury argument that the V-cut procedure about which defendant testified differed from the "transverse plane osteotomy" he referred to in the operative record, and that his testifying he performed the stabilizing V-cut was "more convincing than just cutting it in two." In any event, plaintiff's present argument does not answer defendant's argument — if the latter is otherwise correct — that the definition of "transverse" was evidentiary and beyond the proper scope of a jury instruction.

to a supplemental instruction in the form of a dictionary definition. The dicta in *Cummings* does indicate that it is proper for trial courts to instruct jurors on the definition of words which are not "words of art."[2] At least for purposes of this case, it is more satisfactory to inquire whether the definition read by the court was evidentiary of a fact which the jury was to find.

Former ORS 17.255(1) (which was repealed by Or L, 1979, ch 284, § 199, but which was in effect at the time of trial) provided:

> "In charging the jury, the court shall state to them all matters of law which it thinks necessary for their information in giving their verdict, but it shall not present the facts of the case, but shall inform the jury that they are the exclusive judges of all questions of fact."

*See also* ORCP Rule 59E.

■    In our view, the meaning of "transverse plane osteotomy" was as much a matter for proof by the parties rather than instruction by the court as were the meanings of "Austin bunionectomy," "V-cut," "hallux varus," and the many other medical terms which were involved in this case. We do not agree with plaintiff that the word "transverse" is, in this context, something other than a "uniquely medical term." The word's only possible relevance here is as part of the medical term "transverse plane osteotomy." Indeed, the jury had requested that that entire term rather than the first word alone be defined by the court.

It was error to instruct the jury on the meaning of "transverse." The error was prejudicial. As earlier indicated, the closing argument of plaintiff's attorney had suggested to the jury — absent any then-existing evidentiary basis — that the words "transverse plane osteotomy" in the operative record referred to a surgical procedure other than the one defendant testified he performed. That suggestion

---

[2] We do not comment at this time on the correctness of our statement in *Cummings* that the word "tumultuous," as used in an indictment, is not a word of art.

reflected both on the substance of plaintiff's allegations and on defendant's credibility. It is possible, if not apparent, that the definition which the jury requested and the one the court read were sought and/or used by the jury to test the validity of plaintiff's unfounded suggestion in oral argument. We therefore reverse and remand, and we turn to the other arguments of defendant which raise issues likely to arise on retrial.

■      Many of defendant's assignments of error relate to the admissibility of the testimony of plaintiff's two expert witnesses, both of whom are orthopedists, regarding the adequacy of defendant's professional performance. Defendant contends that the standard of care by which his performance is measurable is whether he exercised the degree of skill and care of ordinary *podiatrists* practicing in Eugene or similar communities, and that the testimony of the two *orthopedists* should not have been received.

Defendant relies on *Sheppard v. Firth,* 215 Or 268, 334 P2d 190 (1959), in which the trial court permitted a medical doctor to testify as an expert on the adequacy of the defendant chiropractor's manipulative treatments of the plaintiff's injured vertebrae. The Supreme Court reversed, stating:

"The defendant assigns as error the ruling of the trial court which permitted the medical doctor to express this opinion.

"In *Wemett v. Mount,* 134 Or 305, 313, 292 P 93, we said:

" 'It is the general rule that in a malpractice action a physician or surgeon is entitled to have his treatment of his patient tested by the rules and principles of the school of medicine to which he belongs, and not by those of some other school, because a person professing to follow one system or school of medicine cannot be expected by his employer to practice any other, and if he performs a treatment with ordinary skill and care in accordance with his system, he is not answerable for bad results.'

"See, also, *Hilgedorf v. Bertschinger,* 132 Or 641, 645, 285 P 819.

"There is, of course, an exception to this general rule which arises whenever the methods of treating a particular ailment are generally the same in either school, *Wemett v. Mount,* supra; or where a physician, although trained in one school, steps out of the practice of his own school and attempts to treat a patient in the manner practiced by another school. *Hilgedorf v. Bertschinger,* supra. Neither of these exceptions are applicable to the facts of this case.

"This general rule, that a practitioner is entitled to have his treatment of his patient tested by the rules and principles of the school to which he belongs, applies to drugless practitioners. See cases cited in 19 ALR2d 1198, § 6, including therein *Hilgedorf v. Bertschinger,* supra.

"The thought contained in the quotation from *Wemett v. Mount,* supra, is that a person seeking treatment from a practitioner of a given school agrees to accept the curative practices and belief of that particular school, and if the practitioner treats the patient reasonably skillfully in accordance with the teachings of his school he incurs no liability." 215 Or at 271-72.

Later decisions have addressed the "exception to [the] general rule" referred to in *Sheppard. Dowell v. Mossberg,* 226 Or 173, 359 P2d 541 (1961), also involved testimony by the plaintiff's physician experts in a malpractice action against a chiropractor. In *Dowell,* the plaintiff alleged that the chiropractor had been negligent in failing to diagnose her diabetic condition. The Supreme Court distinguished *Sheppard* and held that the testimony of the physician experts was admissible because

"[t]he reason for the general rule which excludes the opinion of an expert in one branch of the healing arts as evidence of the standard of practice to be applied to a member of another profession is that such testimony is irrelevant. Before a defendant can be held liable for malpractice the plaintiff must show that the defendant failed to exercise that degree of skill and care which an ordinary practitioner in the same line of practice in the community would have exercised. It goes without saying that a healer who holds himself out to the public as possessed of a

limited variety of science or skill should not be held, in a malpractice case, to a degree of science or skill which he has never claimed.

"Obviously, if a practitioner holds himself out as a diagnostician and undertakes to examine all sufferers who present themselves, he is in competition with those who are licensed and recognized as competent to diagnose and treat a wide variety of human ailments. When the practitioner so undertakes, he must exercise the same degree of care and skill as those with whom he seeks to compete. There was ample evidence to support a finding that the defendant held himself out as a general diagnostician.

"In the case at bar, the defendant chiropractor claimed competence in the diagnosis of diabetes. He testified that whenever he detected the malady in a patient he referred the patient to a medical doctor. He testified that he had two or three such cases a year. He also described in detail the procedures used by chiropractors in testing for diabetes. The procedures were generally similar to those described by medical doctors. So long as a chiropractor claims competence to diagnose diabetes, there is no reason in law or logic why he should not be held to the same degree of skill and care as medical doctors in the diagnostic procedure. * * *

"* * * Accordingly, the jury was entitled to consider all the evidence in the case which was relevant to the question of ordinary skill and care in the matter of diagnosing the plaintiff's condition. The jury found that the defendant did not exercise that degree of skill and care required of an ordinary chiropractor in the community." 226 Or at 185-86.

*See also Foxton v. Woodmansee,* 236 Or 271, 289-90, 386 P2d 659, 388 P2d 275 (1963); *James v. Falk,* 226 Or 535, 539, 360 P2d 546, 85 ALR2d 1014 (1961).

It is not wholly clear from the quoted language whether the holding in *Dowell* relates only to the admissibility of expert testimony by practitioners of disciplines other than the defendant's when the action relates to procedures common to the disciplines, or whether the court also intended to hold in *Dowell* that the standard of care is the same for practitioners

of different healing arts in the performance of like procedures. This uncertainty was resolved in *Sutton v. Cook,* 254 Or 116, 458 P2d 402 (1969), an action against a chiropractor for negligence in diagnosing and treating a fracture. The court rejected the plaintiff's argument that the chiropractor, "in treating a fracture, should be held to the standard of care applicable to a physician," 254 Or at 119, and stated:

> "Plaintiff relies upon *Dowell v. Mossberg,* 226 Or 173, 355 P2d 624, 359 P2d 541 (1961). The case is distinguishable. There we reaffirmed the general principle that a person practicing one of the healing arts must exercise only that standard of care and skill which an ordinary practitioner in the same school in that community would exercise. In that case the defendant held himself out as a general diagnostician for all types of human ailments including diabetes. The evidence showed that the procedures employed by chiropractors in the diagnosis of diabetes were generally similar to those described by physicians. We held that the defendant was required to exercise that degree of skill and care required of an ordinary chiropractor in the community. We also held that it was not error to permit medical doctors to testify as to the proper procedure in diagnosing, but this was based upon the well recognized principle that it is proper to allow a practitioner of one school of the healing arts to testify as to the standard of care and skill applicable to another school when the procedures of both schools are substantially the same."[3] (Footnote omitted.) 254 Or at 122-23.

In light of *Sutton,* we accept defendant's contention that the standard of care by which his performance is to be measured is the degree of skill and care

---

[3] It is difficult to reconcile the holding in *Sutton* that the standard of care remains discipline - specific with the rationale of *Dowell* and similar decisions. The rationale is that, in contrast to malpractice actions involving procedures which are unique to a defendant's school of the healing arts, testimony by practitioners from other disciplines becomes relevant to a defendant's standard of care in actions involving professional activities which are common to the witnesses' and the defendant's schools of practice.

The court stated in *Dowell* that, where the chiropractor was performing a service identical to one which medical doctors perform, "there is no reason in law or logic why he should not be held to the same degree of skill and care as medical doctors * * *." 226 Or at 186.

required of an ordinary podiatrist in Eugene or similar communities under similar circumstances.[4] However, we do not agree with defendant that the testimony of plaintiff's experts was wrongly admitted. Orthopedic surgeons, like podiatric surgeons, perform bunionectomies, and the surgical methods they use in doing so are by and large the same. There was evidence that the Austin bunionectomy is not widely used by orthopedists, and one of plaintiff's experts was unfamiliar with the Austin procedure by name. However, we do not understand the common procedure exception to the rule that expert testimony in malpractice actions is limited to practitioners of the defendant's own healing art as referring to specific methodological options within a general kind of diagnostic or therapeutic activity rather than to the general activity itself. The fact that orthopedists and podiatrists both perform surgical bunionectomies is sufficient to make the testimony of plaintiff's orthopedic experts admissible in this case arising out of defendant's performance of such surgery.

In addition to his general contention that plaintiff's orthopedic experts could not testify because they are not podiatrists, defendant also argues that the testimony was inadmissible for a variety of other reasons, most of which relate to the adequacy of the foundation for the experts' opinions. These arguments do not pertain to matters likely to recur on retrial, and we do not address them.

Defendant next argues that instructions regarding informed consent were erroneously given and refused, and that testimony on the informed consent issue was improperly admitted. Defendant's first basis for challenging the admission of the testimony relates to foundation. For reasons earlier noted, that argument does not require discussion here.

Defendant also contends that it was improper to permit one of plaintiff's experts to testify whether

---

[4] We disagree with defendant's contention that, by not giving his requested instruction no. 2, the court failed to so instruct the jury. The law was accurately stated by the court elsewhere in its instructions.

*he* would inform patients of particular surgical risks about which defendant allegedly did not advise plaintiff. Defendant argues that expert opinion is not relevant to the ultimate question of whether there is a duty to disclose a risk, and relies on the statement in *Getchell v. Mansfield,* 260 Or 174, 489 P2d 953 (1971), that

"* * * a plaintiff who alleges that a physician failed to warn him of material risks inherent in his treatment, and to advise him of feasible alternatives, need not produce expert medical testimony that it is the custom of physicians in the same or similar localities to give such warnings in comparable cases. The duty to warn and to advise of alternatives does not arise from and is not limited by the custom of physicians in the locality. Rather, it exists as a matter of law if (1) the risk of injury inherent in the treatment is material; (2) there are feasible alternative courses available; and (3) the plaintiff can be advised of the risks and alternatives without detriment to his well-being. If there is evidence tending to prove all these elements, the plaintiff is entitled to have his case submitted to the jury under proper instructions. In most cases, expert medical testimony will be necessary to establish each of the three elements." 260 Or at 182-83.

The issue in *Getchell,* however, was the converse of the one defendant raises. There, the plaintiff had *failed* to produce expert testimony on whether particular risks and alternative treatments should have been disclosed. The court held that proof was not required on those questions if the underlying facts of materiality, feasible alternatives and absence of detriment were established. It follows an expert may testify about the materiality, feasible alternatives and absence of detriment regarding a contemplated surgery. Although a physician's opinion as to materiality of a given risk will often be based on his own experience, whether he in fact would advise a patient of a certain risk is not material or relevant to the issue. He may advise a patient out of an excess of caution or on personal policy rather than an expert analysis that the risk is material. Such testimony without more would

not be sufficient to establish the materiality of a particular surgical risk. On retrial such testimony, i.e., that a physician would advise his patient of a risk, should be excluded.

■     Defendant argues that the following language from the court's informed consent instruction misstates the law:

"A risk is material when a reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to undergo the proposed therapy."

The criticized language was quoted with approval by the Supreme Court in *Holland v. Srs. of St. Joseph, Seeley,* 270 Or 129, 137, 522 P2d 208, 526 P2d 577 (1974). Defendant acknowledges that source of the language, but nevertheless argues that the language is inconsistent with *Getchell,* which defendant understands as holding that the duty to disclose is not a function of community or other subjective or fluctuating standards. Hence, according to defendant, the way in which a particular patient would perceive a risk is not relevant to the risk's materiality. However, as we read the instruction, it says no more than that a risk is material if it would affect the therapeutic decision of a reasonable person in the patient's position. As so understood, the language does not create a test which is any more subjective than the "reasonable person" test in negligence law. We also note that *Holland* is a more recent case than *Getchell.*

Defendant also argues that the court erred by refusing to give his requested instruction on informed consent. We disagree. The instruction the court did give on the issue correctly states the law.

■     Defendant next contends that the court erred in failing to give Uniform Jury Instruction number 105.01 pursuant to defendant's request. That requested instruction reads:

"A practitioner of the healing arts does not undertake to guarantee a cure or that his treatment will necessarily be successful, and he is not responsible

for lack of success unless that lack of success results from his negligence."

Defendant also assigns error to the court's refusal to give the following related requested instruction:

"A podiatrist does not undertake to warrant a cure or that his treatment shall necessarily be successful, and is not responsible for want of success unless that want of success results from a failure to exercise ordinary care. The fact that plaintiff's condition became worse is not evidence in and of itself of negligence or malpractice on the part of the defendant. You are not to consider the condition of the plaintiff's foot itself, either at this time or at the time defendant's treatment of the plaintiff ceased, as any evidence bearing upon the question of the alleged negligence or malpractice."

We discern no reason why Uniform Jury Instruction number 105.01 should not be given at the new trial. However, much of the second requested instruction is duplicative of Uniform Jury Instruction number 105.01, and language similar to the non-redundant part of the second instruction was recently disapproved in *Coyne v. Cirilli,* 45 Or App 177, 607 P2d 1383, *rev den* 289 Or 155 (1980), where we stated:

"We are of the opinion that the last portion of this instruction, namely, that the condition of the plaintiff's foot when the defendant's diagnosis and treatment ceased could not be considered as any evidence bearing on the question of defendant's negligence, was misleading. We say this because in the context of this case, a jury must of necessity consider the condition of plaintiff's foot at the conclusion of defendant's alleged misdiagnosis and treatment in determining whether defendant had been negligent. * * *" 45 Or App at 183.

The portion of the instruction similar to the language disapproved in *Coyne v. Cirilli, supra,* should not be given on retrial.

Defendant next argues that the court's refusal to give Uniform Jury Instruction number 15.01 was error. That instruction states:

"An act or omission is a cause of damage when, in a direct and unbroken sequence, it produces the damage."

Whether the instruction should be given at the new trial of course depends on whether any conflicting evidence regarding cause is presented at that trial. The instruction should have been given by the court at the first trial.

The final assignment of error which requires discussion in this opinion is that the trial court erred in denying defendant's motion for a directed verdict. There are two bases for defendant's argument. The first is that there was no competent evidence of negligence because, for reasons earlier discussed, defendant considers that the testimony of plaintiff's experts should not have been admitted. For reasons earlier discussed, we disagree.

The second basis is that there was "insufficient evidence of what risks were material in connection with the informed consent issue." Defendant explains that, at the most, the evidence would support a finding that the incidence of hallux varus is 15 percent and that the occurence of the other post-surgical complications plaintiff suffered is less frequent. Defendant argues that risks of that magnitude are not material as a matter of law. The court stated in *Holland:*

"* * * Thus, the jury should consider, when determining whether a risk is or is not material, the likelihood of any injury and its seriousness. If a serious injury might occur from a given method of treatment, the physician must inform the patient of all but extremely remote risks. However, if the potential injury is slight, then the patient need be informed of only those risks which might well occur.* * *" 270 Or at 137-38.

We decline to hold that, under that test, there was no evidence from which the jury could find that the conditions which plaintiff suffered after the surgery were not risks of the surgery and were not material.

Reversed and remanded.

**BUTTLER, J.,** concurring opinion.

I concur in the majority opinion because I agree that the trial court's supplemental instruction defining the word, "transverse," deprived defendant of an opportunity to explain, either by testimony or by argument, that the word's use in the operating records — "transverse plane osteotomy"— was not inconsistent with defendant's testimony that he used the "Austin procedure." Absent that opportunity, the jury could reasonably conclude that defendant was not truthful. Whether defendant's explanation, if any, would be persuasive, would be for the jury, but as the matter was left here, the jury was given the impression that the two procedures were different.

Because I agree that the judgment must be reversed, and the case remanded for a new trial, the other assignments of error become important. The focus of most of the defendant's claims of error is on the proposition that his performance, as a podiatrist, is to be judged by the degree of skill and care required by an ordinary podiatrist in Eugene or similar community under similar circumstances. The majority agree with that proposition. 48 Or App at 693. I do not. If the majority is correct on that point, it would seem to follow that the orthopedic surgeons who testified for plaintiff were not competent to do so because they could not say they were familiar with the standard of skill required of an ordinary podiatrist in Eugene or a similar community.

In agreeing with defendant, the majority state (note 3) that they cannot reconcile the holding in *Sutton v. Cook,* 254 Or 116, 458 P2d 402 (1969) with *Dowell v. Mossberg,* 226 Or 173, 355 P2d 624, 359 P2d 541 (1961). However, there is a clear distinction, and the Supreme Court has made it. *Sutton* is the same kind of case as *Sheppard v. Firth,* 215 Or 268, 334 P2d 190 (1959), relied on by the court in *Sutton.* In both cases, the plaintiff consulted a chiropractor for a skeletal problem and received manipulative treatments for which chiropractors are trained and known,

and in each case the court held that the defendant was entitled to have his method of treatment tested by the standards of care and skill applicable to the school to which he belonged. *Sheppard* was decided in 1959 and *Sutton* was decided in 1969; between those two decisions, the Supreme Court decided *Dowell* in 1961 wherein the defendant chiropractor held himself out as a general diagnostician, but misdiagnosed the plaintiff's diabetes. The Court stated the general rule as set forth in *Sheppard,* but then pointed out the exception that arises when the methods of treatment for a particular ailment are generally the same in either school of medicine. Much of the Court's language is quoted in the majority opinion. 48 Or App at 690-91.

Although there is language in *Dowell* which might be confusing, it must be remembered that defendant was appealing and only assigned error to the admission of testimony from medical doctors, not to the jury instructions.[1] The Court affirmed, saying:

"* * * So long as a chiropractor claims competence to diagnose diabetes, there is no reason in law or logic why he should not be held to the same degree of skill and care as medical doctors in that diagnostic procedure." 226 Or at 186.

The plaintiff in *Sutton* relied on *Dowell* for the proposition just quoted. The Court, however, pointed out the distinction between *Dowell* and *Sheppard,* holding that *Sheppard* controlled there because the defendant chiropractor did not hold himself out as anything other than a practitioner of chiropractic.

---

[1] The Court in *Dowell,* after deciding that a chiropractor, under the circumstances related, should be held to the same degree of skill and care as medical doctors, stated:

"The jury found that the defendant did not exercise that degree of skill and care required of an ordinary chiropractor in the community." 226 Or at 186.

Because the defendant was appealing, obviously he did not complain about an instruction which fixed the standard of care he must meet; it appears that the trial court had instructed the jury that the standard was that of an ordinary chiropractor in a community.

Here we have a *Dowell* type case. The defendant held himself out as a "surgical podiatrist," and the surgical procedures employed were those employed by orthopedic surgeons in performing a bunionectomy. Under these facts, the defendant must exercise the same degree of care and skill as those with whom he seeks to compete. *Dowell, supra,* at 186. Having come to that conclusion, I have no problem with the admission of the testimony of the two orthopedic surgeons.

As the majority opinion stands, on retrial the jury will be instructed that defendant's performance is to be judged by the degree of skill and care required by an ordinary podiatrist in Eugene or similar community under similar circumstances. If plaintiff loses, we will have the question squarely presented to us, and there is no reason not to face the issue now.