Argued and submitted March 2, decision of Court of Appeals affirmed, remanded
to trial court for new trial December 9, 1981

CREASEY,
*Petitioner on review,*
*v.*

HOGAN,
*Respondent on review.*

(No. 77-3743, CA 14498, SC 27443)

637 P2d 114

William F. Frye, Eugene, argued the cause for petitioner. With him on the brief was Frye, Smith & Franz, Eugene.

Richard W. Butler, Eugene, argued the cause for respondent. With him on the briefs were George A. Burgott, and Thwing, Atherly & Butler, Eugene.

Before Denecke, Chief Justice, and Lent, Linde, Peterson, Tanzer, and Campbell, Justices.

PETERSON, J.

## PETERSON, J.

The defendant podiatrist in this malpractice action appeals from a judgment awarding damages to plaintiff for injuries allegedly sustained as a result of his negligence in the course of podiatric surgery and thereafter. The Court of Appeals reversed, *Creasey v. Hogan,* 48 Or App 683, 617 P2d 1377 (1980). We accepted review to consider (1) the circumstances under which an expert from one discipline of the healing arts can express an opinion as to the fault of a defendant whose practice is within another discipline of the healing arts, (2) the standard of care of a podiatrist as compared with the standard of care required of medical doctors who perform the same surgical procedure, and (3) whether the trial court erred in providing the jury with a medical dictionary definition of the word "transverse" in response to the jury's request, during its deliberations, for a definition of the phrase "transverse plane osteotomy."

▪ We hold:

1. Where the principles, techniques, methods, practices or procedures of one branch of the healing arts concur or are generally the same as those of another branch of the healing arts, in a malpractice case against a practitioner in one branch, opinion evidence on a point concerning such matters from a practitioner in another branch is admissible.

2. In a malpractice action, medical practitioners are entitled to have their treatment of a patient tested by the principles of the school of medicine to which they belong.

3. After a jury has commenced its deliberations, it is improper for a trial court to read them a dictionary definition concerning the meaning of technical words referred to in the testimony, the meaning of which may have reflected on their evaluation of the evidence or the credibility of witnesses.

### I
### THE FACTS

Plaintiff's family medical doctor referred her to the defendant for treatment of bunions on both feet, with the

added complication of what was described by expert testimony as a bilateral "hallux valgus" condition in which her great toes pointed toward the outside of her feet. Defendant, a podiatrist licensed in the State of Oregon, performed corrective surgical procedures commonly known as "bunionectomies," on both of the plaintiff's feet. The surgery was performed at Valley Lane Hospital, a general osteopathic hospital in Eugene, Oregon.

The defendant testified that he performed a type of bunionectomy on plaintiff's right foot called an "osteotomy," or "Austin" procedure. An osteotomy is most simply described as a "bone-cutting" operation in which the head of the metatarsal bone of the big toe is cut through and repositioned, with an "Austin" type of osteotomy being one in which the surgeon employs a specific "V-shaped" cut. The defendant performed a bunionectomy termed a modified "McBride" procedure on the plaintiff's left foot, which primarily involved a repositioning of soft tissue. Both procedures involved removal of the "exostosis," or hypertrophied bone, which formed the bunion.

There was evidence that following surgery, plaintiff's right great toe (upon which the "Austin" osteotomy was performed), exhibited a post-operative "plantar flexion deformity" in which the tip of the metatarsal bone (which had been cut in surgery) drifted into an abnormally downward position, resulting in discomfort, callous formation, and a shortening of the great toe. Plaintiff also claimed that her left great toe (upon which the "modified McBride" procedure had been performed) rather than being oriented straight forward following surgery, drifted toward the inner side of the foot (pointing toward the great toe of the other foot) in what is termed a "hallux varus" deformity, which is the opposite of the "hallus valgus" condition that existed prior to surgery.

There was expert testimony that bunionectomies are commonly performed by both orthopedic surgeons and podiatrists, both of whom are licensed to perform foot surgery, and that there are many different "bunionectomy" procedures performed by both schools of practice.

Over defendant's objection, two orthopedic surgeons were permitted to testify concerning defendant's treatment (pre-surgical, surgical and post-surgical) of the plaintiff and concerning risks incident to the surgical procedures.

As will be seen in Part V of this opinion, we affirm the Court of Appeals decision to reverse and remand for a new trial because the trial court provided the jury with a medical dictionary definition of the word "transverse." There are 29 other assignments of error concerning alleged errors in permitting two orthopedic surgeons to express opinions as to whether the defendant's care and treatment of the plaintiff were negligent. In view of the fact that the case is being remanded for a new trial, it is not necessary for us to set forth herein at any great length the facts as to the manner in which the assigned errors arose. But because many of the same questions concerning admissibility of evidence and instructions may arise on retrial, it is appropriate to restate the applicable rules regarding the admissibility of expert testimony of practitioners from one discipline in a malpractice case against a practitioner from another discipline and regarding the standard of care of a practitioner from one discipline whose practices, procedures or techniques concur with, or are generally similar to, the practices, procedures or techniques of another discipline.

## II
## ADMISSIBILITY OF EXPERT TESTIMONY OF MEDICAL DOCTOR AGAINST PODIATRIST

Since 1930, this court has considered many appeals involving malpractice claims against medical practitioners other than medical doctors. Over the protestations of the plaintiffs (the patients), we have consistently adhered to the rule that practitioners such as osteopaths, chiropractors and podiatrists are entitled to have their conduct in the treatment of patients tested by standards applicable to the system to which they belong.[1] The rule has otherwise been

---

[1] *Sutton v. Cook,* 254 Or 116, 121, 458 P2d 402 (1969); *Sheppard v. Firth,* 215 Or 268, 271, 334 P2d 190 (1959); *Dowell v. Mossberg,* 226 Or 173, 185, 355 P2d 624, 359 P2d 541 (1961); *Wemett v. Mount,* 134 Or 305, 313, 292 P 93 (1930); *Hilgedorf v. Bertschinger,* 132 Or 641, 646, 285 P 819 (1930).

Although the opinion in *Dowell v. Mossberg, supra,* was withdrawn for other reasons, 226 Or at 190, the reasoning of the opinion is valid.

stated as holding the defendant to the standard of skill and care required of an ordinary practitioner of that discipline in the community or a similar community.[2] The resolution of this issue turned upon the determination of the appropriate *rule of law* to be adopted in framing the appropriate standard of care.

Many of the medical malpractice cases we have considered were cases involving practitioners such as medical doctors, osteopaths or chiropractors who have been held liable to their patients on the basis of the testimony of witnesses from another school of medicine. In most of these cases, the practitioner, after losing in the trial court, was asserting (as the podiatrist defendant asserts in the case at bar) that the trial court erred in permitting medical practitioners from another discipline to express expert opinions that the defendant, in treating the patient, was negligent.[3] The resolution of this issue turned upon the statement of the appropriate *rule of evidence* to be applied in determining the admissibility of evidence.

The following oft-quoted paragraph from *Wemett v. Mount,* 134 Or 305, 313, 292 P 93 (1930), states both the rule of law and the rule of evidence:

"It is the general rule that in a malpractice action a physician or surgeon is entitled to have his treatment of his patient tested by the rules and principles of the school of medicine to which he belongs, and not by those of some other school, because a person professing to follow one system or school of medicine cannot be expected by his employer to practice any other, and if he performs a treatment with ordinary skill and care in accordance with his system, he is not answerable for bad results. However, the rule, which confines the inquiry as to a practitioner's skill and care to the rules and principles of the school of medicine to which he belongs, does not exclude the testimony of physicians of other schools or experts in other lines when such testimony bears on a point as to which the

---

[2] *Sutton Cook,* 254 Or 116, 123, 458 P2d 402 (1969); *Foxton v. Woodmansee,* 236 Or 282, 289, 386 P2d 659, 388 P2d 275 (1964).

[3] *Foxton v. Woodmansee,* 236 Or 271, 386 P2d 659, 388 P2d 275 (1964); *James v. Falk,* 226 Or 535, 538-539, 360 P2d 546 (1961); *Dowell v. Mossberg,* 226 Or 173, 184-185, 355 P2d 624, 359 P2d 541 (1961); *Sheppard v. Firth,* 215 Or 268, 271-272, 334 P2d 190 (1959); *Wemett v. Mount,* 134 Or 305, 313, 292 P 93 (1930); *Hilgedorf v. Bertschinger,* 132 Or 641, 645-647, 285 P 819 (1930).

principles of the schools do or should concur, such as the dangers incident to the use of X-rays, or the existence of a condition that should be recognized by any physician * * *." 134 Or at 313.

The first sentence of the quoted material defines the rule of law as to the practitioner's duty of care ("ordinary skill and care in accordance with his system"). The second sentence states the rule of evidence governing the admissibility of expert opinion testimony from a practitioner of a different school of medicine whether the defendant's treatment was proper (Testimony is permitted "when such testimony bears on a point as to which the principles of the schools do or should concur.").

Later cases have refined and restated, but have not changed, the rules. In *Sheppard v. Firth,* 215 Or 268, 271, 334 P2d 190 (1959), a case in which the trial court permitted a medical doctor to testify that a chiropractor's treatment of a patient was not proper, we listed a second exception to the rule of evidence set forth in *Wemett v. Mount, supra:*

"There is, of course, an exception to this general rule which arises whenever the methods of treating a particular ailment are generally the same in either school, *Wemett v. Mount,* supra; or where a physician, although trained in one school, steps out of the practice of his own school and attempts to treat a patient in the manner practiced by another school. * * *" 215 Or at 271.

Concerning the *Wemett v. Mount* quotation set forth above, the court went on to say:

"The thought contained in the quotation from *Wemett v. Mount,* supra, is that a person seeking treatment from a practitioner of a given school agrees to accept the curative practices and belief of that particular school, and if the practitioner treats the patient reasonably skillfully in accordance with the teachings of his school he incurs no liability.

"Therefore, it is apparent the courts are not concerned with the merits of the various systems that seek to relieve human ailments. It is sufficient to state that many of our citizens believe in the efficacy of drugless treatments and secure the services of those practicing them.

"The unfairness of permitting a practitioner of one school, who uses one method to cure an ailment, to measure the treatment and skill of a practitioner of another school, who uses a different method, must be equally apparent." 215 Or at 271-272.

Since *Wemett* and *Sheppard* we have consistently adhered to the rules they set forth. But the language used in some of our opinions may have created confusion in failing to distinguish between the rule of law pertaining to the defendant's duty of care and the rule of evidence concerning the admissibility of expert testimony from practitioners of another medical discipline.

These quotations from later cases are illustrative.

*Dowell v. Mossberg,* 226 Or 173, 186, 355 P2d 624, 359 P2d 541 (1961) (a claim against a chiropractor for negligence in failing to diagnose diabetes in which medical doctors were permitted to testify that the chiropractor's treatment was not proper):

"In the case at bar, the defendant chiropractor claimed competence in the diagnosis of diabetes. He testified that whenever he detected the malady in a patient he referred the patient to a medical doctor. He testified that he had two or three such cases a year. He also described in detail the procedures used by chiropractors in testing for diabetes. The procedures were generally˙ similar to those described by medical doctors. *So long as a chiropractor claims competence to diagnose diabetes, there is no reason in law or logic why he should not be held to the same degree of skill and care as medical doctors in the diagnostic procedure.* \* \* \*" (Emphasis added.)[4]

*James v. Falk,* 226 Or 535, 360 P2d 546 (1961) (claim against osteopath for negligence in treating a fracture, expert testimony by medical doctor):

" \* \* \* There was evidence from which the jury could have concluded that both schools of practice followed the same precepts in treating a fracture of the kind in question. On the other hand, if there was any difference, which we cannot find from the record, the evidence would also establish that defendant relied on standards followed by

---

[4] As will be seen below, the last sentence might better have read:

"Where the methods of treatment for a particular ailment are generally the same in either school, expert testimony from practitioners from either school is admissible."

by the medical doctors to justify the course of treatment he adopted in this case. The evidence submitted by defendant's witnesses would lead one to believe that the basic difference between the two schools was that of philosophy. There was no showing that philosophy had any value in treating a severe fracture of the femur." 226 Or at 539.

In the opinions referred to above we stated the test for admissibility of expert medical testimony from other disciplines or schools in various but not inconsistent ways. In *James v. Falk, supra,* the evidence was allowed because "both schools of practice *followed the same precepts.*" 226 Or at 539. *Dowell v. Mossberg, supra,* approved the reception of evidence because "the procedures were generally similar," 226 Or at 186, or because "the methods of treatment for a particular ailment are *generally the same,*" 226 Or at 185. *Sheppard v. Firth, supra,* allowed the evidence if "the methods of treating a particular ailment are *generally the same.*" 215 Or at 271. And *Wemett* approved such testimony if it "bears on a point as to which *the principles of the schools do or should concur.*" 134 Or at 313. Our most recent opinion, *Sutton v. Cook,* 254 Or 116, 123, 458 P2d 402 (1969), states that evidence from a practitioner of another school is admissible "when the procedures of both schools are *substantially the same.*"

Some of the opinions cited above have discussed the admissibility of such testimony in terms of the duty of care. In *Dowell v. Mossberg, supra,* we stated that "[s]o long as a chiropractor claims competence to diagnose diabetes, there is no reason in law or logic why he should not be held to the same degree of skill and care as medical doctors * * *." 226 Or at 186.

 The admissibility of testimony from practitioners from other disciplines turns not on whether the duty of skill and care is the same, but upon whether the procedures, practices, precepts, methods, treatments or techniques which are at issue are identical or generally similar.[5] Therefore, in laying the foundation for such

___

[5] Of course, if practitioners step out of the practice of their school, and attempt to treat a patient in the manner practiced by another school, they will be judged by the practices of the other school, even if the procedures and practices are different. *Sheppard v. Firth,* 215 Or 268, 271, 334 P2d 190 (1959).

testimony, if it is shown that there exists an appropriate similarity in procedures or techniques, that in and of itself is a sufficient foundation for the expression of expert opinion that the defendant's conduct was or was not proper.

## III

## THE STANDARD OF CARE IN MEDICAL MALPRACTICE CASES

The plaintiff also asserts that the Court of Appeals erred in holding (48 Or App at 692-693) that the standard of care by which the defendant's performance was to be measured "is the degree of skill and care required of an ordinary podiatrist in Eugene or similar communities under similar circumstances." The plaintiff claims that a podiatrist who employs the same surgical standard as an orthopedic surgeon should be held to the same degree of skill and care as the physician in that procedure. Plaintiff relies upon this statement from *Dowell v. Mossberg, supra,* that:

> " * * * Before a defendant can be held liable for malpractice the plaintiff must show that the defendant failed to exercise that degree of skill and care which an ordinary practitioner *in the same line of practice* in the community would have exercised." 226 Or at 185.

Until now, the settled rule in Oregon has been that medical practitioners are entitled to have their conduct tested by the standard of care of the school or method to which they belong. Expressed otherwise, the standard of care is that of a reasonably prudent, careful and skillful practitioner of that discipline in the community or a similar community under the same or similar circumstances.[6]

We confess to some difficulty in finding any logic in the plaintiff's contention. The plaintiff's position appears to be that if practitioners of the two disciplines perform identical procedures, the duty of care is the same, and the jury should be instructed that the defendant's duty of care is that of both disciplines. Even if the duty of care of both disciplines is the same because the procedures are

---

[6] *Foxton v. Woodmansee,* 236 Or 271, 289, 386 P2d 659, 388 P2d 275 (1964); *Wemett v. Mount,* 134 Or 305, 313, 292 P 93 (1930); *Hilgedorf v. Bertschinger,* 132 Or 641, 646, 285 P 819 (1930).

identical, an instruction which holds the defendant to the degree of care of reasonably prudent practitioners within the defendant's discipline necessarily is equivalent to an instruction that the practitioner must meet the standards of both. We discussed a similar contention in *Foxton v. Woodmansee*, 236 Or 271, 290, 386 P2d 659, 388 P2d 275 (1964), as follows:

" * * * Since the defendant is an osteopath and the evidence reveals without contradiction that, so far as this case is concerned, he was governed in his treatment of the plaintiff's injury by the same norms that apply to medical doctors, it was entirely proper for the court to instruct upon the standard of care applicable to osteopaths. It seems to us that the plaintiff's criticism of the instruction is captious." 236 Or at 290.

It is also appropriate to note that the statutory standard of care applicable to medical doctors under ORS 677.095 is:

"A physician licensed to practice medicine by the Board of Medical Examiners for the State of Oregon has the duty to use that degree of care, skill and diligence which is used by ordinarily careful physicians in the same or similar circumstance in his or a similar community."

Although ORS chapter 682, which concerns podiatrists, has no counterpart to ORS 677.095, we see no reason why podiatrists should not continue to be held to a similar standard, measured by the degree of skill and care required of an ordinarily careful podiatrist in the community or similar communities under similar circumstances.

IV

ADMISSIBILITY OF TESTIMONY OF ORTHOPEDIC SURGEONS

The defendant repeatedly objected to the testimony of orthopedic surgeons from San Francisco and Eugene on the ground that it had not been established that they were "familiar with the standard of practice of podiatrists in the Eugene area or a similar community." The defendant further asserts that "if practitioners of other schools are otherwise allowed to testify as to proper common procedures, they must first, as a foundation, testify that they are familiar with the applicable standard of practice in the community or a similar community."

There is support for these propositions. For example, the writer of an annotation entitled "Expert Witness in Malpractice Case," 8 ALR2d 772, 774, cites numerous cases standing for this proposition:

> "It is uniformly held that, to render competent in a malpractice case the expert testimony of a physician or surgeon from one community as to the standard of medical treatment required of the defendant practicing in another community, the witness must have knowledge of and familiarity with the practice and standard of the locality in question, or of similar or like communities, or of similar localities in the same general neighborhood."[7]

The rule of law is that practitioners must exercise that degree of care and skill which an ordinary practitioner, in the same discipline in that community or a similar community, would exercise. As stated above, this is not a rule of evidence, but a rule of law.

■ The evidence question is one of foundation or competency: Can an out-of-town expert testify as to the propriety of a local practitioner's treatment absent some knowledge of the standard of medical treatment in the community? The answer to the question has to be in the negative, but that does not end the inquiry, or even further the inquiry very much.

The cases discussed in part II above make it clear that medical experts from one discipline are permitted to express expert opinions as to the appropriateness of the other practitioner's treatment not because they have been asked whether they are familiar with the skill and care customarily exercised by practitioners of the other discipline, but because they are familiar with the methods, practices, and procedures utilized by such practitioners. This rule applies as well to practitioners within the same discipline. The reason why one Eugene orthopedic surgeon is qualified to testify against another Eugene orthopedic

---

[7] *Compare,* however, this less-strong statement from the superseding annotation at 37 ALR3d 420, 426:

" * * * However, there is authority for the proposition that a medical witness from a community other than the defendant's must show familiarity with the standard of skill and care customarily observed by other physicians in good standing in the defendant's community before he will be deemed competent to testify to the standard of care that the defendant should have observed."

surgeon is not because the witness is aware of the standard of skill and care normally exercised by orthopedic surgeons in Eugene, but because the witness is familiar with the method of treatment customarily used by members of the profession practicing in that locality.

The inquiry, when considering whether the testimony of an expert with appropriate education and training can be received, is whether the expert has knowledge of the method of treatment customarily used by reasonably careful practitioners in the community or a similar community. Asking a witness if he or she "is familiar with the applicable standard of practice in the community" may be intended to evoke the response that the witness is familiar with the method of treatment, but the question is ambiguous in the sense that it suggests that the reference is to the legal standard of care, rather than the medical standard of proper medical practice. The reason the witness is permitted to express an opinion at all is not because of the witness's familiarity with the legal standard—for the witness may not know (and need not know) what is the legal standard—but because of the witness's knowledge of what constitutes proper medical treatment.

We hold that if a witness's qualifications (by virtue of education or training) are otherwise established, the area of inquiry should be directed to his or her knowledge of the methods of customary and proper medical treatment in that or a similar community, not his or her knowledge of the "standard of care" or the "standard of skill."[8] The

---

[8] This colloquy involving the trial court and counsel illustrates the confusion that can arise in talking about standard of care rather than knowledge of methods customarily used in the community:

"THE COURT: * * *.

"It is by virtue of the fact that, assuming there is a bridge here between the two professions by performance of a similar operation, which the Doctor has indicated would be common to both as far as medical standards are concerned, and that's the bridge I have, if there is one. Whether that is good enough or not may be for the jury ultimately to decide.

"I think there is some evidence, at least, of what the standard is concerning this common profession, at least on this particular operation. And at this juncture at least is evidence of what that standard would be in the community. Granted that it could be established or done in a more direct fashion, if there was another podiatrist that would tell us this."

"* * * * *.

competency of the expert to express an opinion is not established by knowledge of the legal standard of care but by knowledge of what is proper conduct by practitioners in the community or a similar community under circumstances similar to those which confronted the defendant. In the case at bar, there is evidence that podiatrists and orthopedic surgeons both treat bunions and hallux valgus; that the methods of treatment are similar; that the methods followed in San Francisco do not differ from those followed in the Eugene area; that both disciplines rely upon and follow some of the same texts; that both prescribe and read x-rays of the foot; that podiatrists and orthopedic surgeons attended the same medical conferences, at which the Austin surgical procedure was discussed; and that the McBride bunionectomy is commonly used by orthopedic surgeons and podiatrists. Such a foundation is sufficient to allow the testimony of both orthopedic surgeons.

■ Similar admissibility questions will arise in other cases in the future. The party offering such evidence must show (1) that the witness possesses the necessary skill and knowledge to arrive at an intelligent conclusion touching the subject matter of the dispute, *Malila v. Meacham,* 187 Or 330, 336, 211 P2d 747 (1949), and (2) that the two disciplines, in their treatment of patients under circumstances similar to those which confronted the defendant, apply methods or practices which are identical or generally similar to those followed by persons practicing the defendant's discipline in that or a similar community. Such a showing can be made in numerous ways.

---

"MR. BUTLER: Well, of course, that's not my objection, Your Honor. I'm saying that the standard that my client is to be tested by is the standard in the community for podiatrists. And if this Doctor knows what the standard is, I presume he can testify that he knows that.

"But, so far, none of the Doctors have testified that they know what the standard is.

"MR. FRYE: Well, I think it's quite clear, Your Honor, that we know what the standards are for podiatrists as far as performing operations in hospitals. Now whether it's different in their offices, I don't know, but I think it's fair to say that we know what the standard of medical care is in this community for a podiatrist performing this operation."

## V

## GIVING THE DEFINITION
## TO THE JURY

 The Court of Appeals held that the trial court prejudicially erred in instructing the jury, after it had retired to deliberate, on a medical dictionary definition of the word "transverse" after the jury's request for a definition of the term "transverse plane osteotomy." Providing the dictionary definition to the jury after it had commenced deliberations was improper for three reasons.

First, to some extent, the giving of the definition to the jury was the presentation of evidence, and neither party had an opportunity to meet such evidence. As the Court of Appeals correctly noted, the term "transverse" is only relevant in this case in the context of the medical term "transverse plane osteotomy." The six days of trial consisted, to a large extent, of expert testimony from both parties explaining the nature and propriety of the procedures performed by defendant, including the "Austin" bunionectomy, and the relationship of those procedures to plaintiff's condition following the surgery. There was defense testimony that the "Austin" bunionectomy does not require post-operative x-rays because of the inherently stable nature of the "V-cut" employed in the procedure. There was no indication during the testimony that defendant might not have performed this "Austin" procedure. However, during closing arguments, the plaintiff's attorney made the follow remarks:

> "In these hospital records that are in evidence, you can go through them page by page. There is no mention of the Austin bunionectomy at all, no such mention. As a matter of fact, the operative report that Dr. Hogan made out doesn't mention this Austin bunionectomy. Remember how it was drawn up here like this? I'll tell you why I think that might be important to the defendant's case in a moment. How did he describe it in here? He didn't give it that way. He calls it a transverse plane osteotomy. Our experts don't know either. They weren't at the operation so they don't know what kind of cutting was done. All we can go by is what is in the medical reports here. It would

be a lot easier for them to argue to you people about the impossibility of a shift in this metatarsal head if they could say look what we did, we cut this thing in such a fashion that it couldn't move at all. That is more convincing than just cutting it in two."

"You can make what you want out of Dr. Hogan's chart, but you will find if you read it on August 4th, under the date of August 4th, that we find in his record the first mention of Austin, and you will find that it is entered there in a different color ink than the rest of the entries."

In our recent decision in *Bend Millwork v. Dept. of Revenue,* 285 Or 577, 592 P2d 986 (1979), a tax case in which we were sitting as factfinder "anew upon the record," we resisted the temptation to "extend" the record by such means as consulting a dictionary, saying,

"As we leave those fields, however, self-restraint must be exercised in order to avoid the taking of evidence from a source not subject to confrontation and cross-examination. We would not allow a jury during deliberation to send out for the opinion of an outside expert as to the true meaning of a term upon which the experts called as witnesses in open court had disagreed. It follows that we should not allow ourselves to do so when discharging our fact finding function. This is not to say that, given the different circumstances in which judges and juries discharge that function, judges cannot resort to outside reading in order to better understand the evidence, but the judge must be ever conscious that the material read is not to be considered as evidence itself unless the material is a proper subject of judicial notice. Even then the judge must be careful to recognize that he is actually receiving evidence by way of judicial notice and follow the governing procedural rules of law." 285 Or at 584.

The instruction of the jury as to the meaning of the term "transverse," in the context of the medical term "transverse plane osteotomy" is analogous to the court's allowing an expert to present additional evidence on the type of procedure defendant indicated in his operative report that he had performed. We know of no case in which it has been held proper to reopen the case and receive new evidence after the jury has commenced its deliberations, and we do not commend the practice.

The definition of "transverse," in the context of its meaning as part of a surgical procedure, the character of which was either not explained or was imperfectly explained to the jury during the trial, may well have influenced the jury in considering the plaintiff's suggestion, in oral argument, that the defendant had not performed the inherently stable "Austin" bunionectomy and may also have influenced their conclusion in weighing the defendant's overall credibility.

Second, the giving of the instruction violated ORS 17.255(1) (which was repealed by Or Laws 1979, ch 284, § 199, but which was in effect at the time of trial) which then provided:

> "In charging the jury, the court shall state to them all matters of law which it thinks necessary for their information in giving their verdict, but it shall not present the facts of the case, but shall inform the jury that they are the exclusive judges of all questions of fact."

Although the phrase within ORS 17.255(1) that "* * *[the court] shall not present the facts of the case * * *" is normally considered to be a prohibition against commenting on the evidence,[9] the presentation of evidence by means such as were involved here is prohibited, as well. *Compare, Mayor v. Dowsett*, 240 Or 196, 222, 400 P2d 234 (1965).

 Third, to the extent that the contents of a dictionary are subject to judicial notice under ORS 41.410,[10] the

---

[9] *Compare* ORCP 59E which currently provides:

"The judge shall not instruct with respect to matters of fact, nor comment thereon."

[10] ORS 41.410(1):

"There are certain facts of such general notoriety that they are assumed to be already known to the court and evidence of them need not be produced. The following facts are assumed to be thus known but the court may resort for its aid to appropriate books or documents of reference:

"(1) The true significance of all English words and phrases, and all legal expressions."

"* * * * *."

*Compare* this language from *Martin v. Eagle Development Co.*, 41 Or 448, 456, 69 P 216 (1902):

normal procedure under which evidence is adduced by way of judicial notice is for the party seeking judicial notice of a fact to request that judicial notice be taken of that fact, so that such evidence need not otherwise be produced. Normally, such a request is made during the presentation of evidence and at all events prior to the commencement of jury deliberations, so that the court can, when appropriate to do so, instruct the jury that the facts are as judicially noted by the court.

The Court of Appeals concluded that the error was prejudicial. We adopt their analysis:

"In our view, the meaning of 'transverse plane osteotomy' was as much a matter for proof by the parties rather than instruction by the court as were the meanings of 'Austin bunionectomy,' 'V-cut,' 'hallux varus,' and the many other medical terms which were involved in this case. We do not agree with plaintiff that the word 'transverse' is, in this context, something other than a 'uniquely medical term.' The word's only possible relevance here is as part of the medical term 'transverse plane osteotomy.' Indeed, the jury had requested that that entire term rather than the first word alone be defined by the court.

"It was error to instruct the jury on the meaning of 'transverse.' The error was prejudicial. As earlier indicated, the closing argument of plaintiff's attorney had suggested to the jury—absent any then-existing evidentiary basis—that the words 'transverse plane osteotomy' in the operative record referred to a surgical procedure other than the one defendant testified he performed. That suggestion reflected both on the substance of plaintiff's allegations and on defendant's credibility. * * *" 48 Or App at 688-689.

The decision of the Court of Appeals is affirmed. Remanded to the trial court for a new trial.

---

"* * * Judicial notice will be taken of the true signification of all English words and phrases and all legal expressions: Hill's Ann. Laws, § 708, subd. 1. It is the ordinary meaning of current words and phrases to which the notice extends.* * *"

ORS 41.410 was repealed by Oregon Laws 1981, chapter 892, section 98. Compare section 201 of the Oregon Evidence Code, 1980 Or Laws ch 892, which concerns judicial notice. Section 201(e) provides that a party "* * * is entitled * * * to an opportunity to be heard as to the propriety of taking judicial notice." Also see F. Lacy, Oregon Evidence Law in the Sixties: Problems, Patterns, and Projections, 49 Or L Rev 188, 209 (1970).